UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------ x

PLANNED PARENTHOOD OF NEW YORK
CITY, INC.,

                    Plaintiff,

          - against -

U.S. DEPARTMENT OF HEALTH AND
HUMAN SERVICES, ALEX MICHAEL AZAR
II in his official capacity
as Secretary of the U.S.
Department of Health and Human
Services, and VALERIE HUBER in her official
capacity as Senior Policy Advisor for the Office
of the Assistant Secretary for Health at the U.S.
Department of Health and Human Services ,

                Defendants.

Civil Action No. 1:18-cv-05680

------------------------------------------------------------ x

## RULE 56.1(a) STATEMENT OF UNDISPUTED FACTS
## BY PLANNED PARENTHOOD NEW YORK CITY, INC.
## IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

In support of its Motion for Summary Judgment, and pursuant to Local Civil Rule 56.1, Planned Parenthood of New York City Inc.  ("PPNYC"), hereby submits the following statement of undisputed facts:

**I.**      **The TPP Program**

1.      In 2009, Congress enacted the Consolidated Appropriations Act, 2010 ("2010 CAA"), which allocated $110 million for the Teen Pregnancy Prevention Program ("TPP Program") "to fund medically accurate and age appropriate programs that reduce teen pregnancy." 123 Stat. 3034, 3253 ("2010 CAA").

2.      The 2010 CAA provides that "$110,000,000 shall be [provided] for making competitive contracts and grants to public and private entities to fund medically accurate and age appropriate programs that reduce teen pregnancy and for the Federal costs associated with administering and evaluating such contracts and grants[.]" *Id.*

3.      The 2010 CAA allocates $75 million of that appropriation "for replicating programs that have been proven effective through rigorous evaluation to reduce teenage pregnancy, behavioral risk factors underlying teenage pregnancy, or other associated risk factors[.]" *Id.*

4.      The 2010 CAA allocates $25,000,000 "for research and demonstration grants to develop, replicate, refine, and test additional models and innovative strategies for preventing teenage pregnancy, and of which any remaining amounts shall be available for training and technical assistance, evaluation, outreach, and additional program support activities[.]" *Id.*

5.      At the same time, in the 2010 CAA, Congress appropriated $4,455,000 "to carry out evaluations (including longitudinal evaluations) of teenage pregnancy prevention approaches[.]" *Id.* HHS, through its Office of the Assistant Secretary for Planning and Evaluation ("ASPE"), and in collaboration with the Office of Adolescent Health ("OAH"), and the Administration for Children and Families' Family and Youth Services Bureau, used these funds to implement an independent, systematic review of the existing research literature on initiatives involving teen pregnancy prevention, called the "TPP Evidence Review." Ex.[1] 18 at 1. HHS selected Mathematica Policy Research, an independent organization, to conduct the TPP Evidence Review, which "identifie[d], assesse[d], and rate[d] the rigor of program impact studies and describes the strength of evidence supporting different program models." Ex. 5 at 1.

---

[1] All citations to "Ex. __" without any other descriptor are to the Exhibits included with the Declaration of Drew A. Harker ("Harker Decl.").

6.      The first TPP Evidence Review, completed in spring 2010, identified 28 programs that had documented positive effects concerning teen pregnancy prevention, sexual transmitted infections ("STIs"), and other associated sexual risk behaviors. The identified programs spanned a variety of approaches, including both abstinence education and comprehensive sexual health education, as well as youth development programs and programs for delivery in clinical settings and for special populations. *See* Ex. 5 at 12*,* 19.

II.     **2010 TPP Program Funding**

7.      The OAH issued two Funding Opportunity Announcements ("FOAs") in April 2010, alongside publication of the 2010 TPP Evidence Review. The FOAs invited applications for five-year grants that were split into "Tier 1" and "Tier 2."

8.      The FOA for the Tier 1 grants ("2010 Tier 1 FOA") provided $75,000,000 solely "for the purpose of replicating evidence-based programs that have been proven through rigorous evaluation to reduce teenage pregnancy, behavioral risks underlying teenage pregnancy, or other associated risk factors." Ex. 3 at 3-4. To meet the application criteria, applicants were required either (1) to choose from the list of the 28 effective programs identified in the TPP Evidence Review, or to propose to replicate a program not already reviewed, but that would have to satisfy "a set of stringent criteria," including that the "research on or evaluations of the program model [met] the screening and evidence criteria" used for the TPP Evidence Review. *Id.* at 6, 7. The 2010 Tier 1 FOA further instructed that in the event a proposed program "does not meet the evidence criteria, the application will be rejected and will not be considered." *Id.*

9.      Applicants for funding through the 2010 FOAs were also "required to maintain fidelity to the original evidence-based program model with minimal adaptations." *Id.* Fidelity is the "degree to which an intervention is delivered as designed" and the "[f]aithfulness with which a curriculum or program is implemented." *Id.* at 44. Significant adaptations would result in an

3

applicant being ineligible for Tier 1 funding and, instead, "would entail applicants applying under Tier 2." *Id.* at 7.

10.     Also consistent with the appropriation, the FOA for the Tier 2 grants ("2010 Tier 2 FOA") directed $25,000,000 in funding to "support research and demonstration programs that will develop, replicate, refine, and test additional models and innovative strategies for preventing teenage pregnancy under the TPP program." Ex. 4 at 5.

11.     Applicants for funding through both FOAs were required "to collect performance measure data and report on them twice a year. These data provided OAH with regular updates about the performance of individual grantees and the TPP program overall, including the number and types of people served, the quality of program implementation, and the dissemination of program results. Program implementation data included fidelity to the model and quality of implementation, both monitored and rated by an independent observer using program fidelity logs and an OAH-provided rating scale for implementation quality." Ex. 9 at 3.

12.     Both FOAs contained application scoring criteria. Ex. 3 at 29-32; Ex. 4 at 29-31. The scoring criteria did not provide any points based on the ideology of the program, or even the specific content of the program.

13.     Both FOAs provided that final award decisions will be made by the Director of the OAH, either solely or in collaboration with the Commissioner of Administration on Children, Youth and Families. Ex. 3 at 32; Ex. 4 at 31.

14.     OAH funded 102 grantees through competitively awarded grants as part of the April 2010 FOAs—75 Tier 1 grants and 27 Tier 2 grants. Between fiscal years 2010 and 2014, the grantees' projects reached more than half a million young people in 39 states and the District

of Columbia, trained a combined 6,100 facilitators, and created 3,800 community partnerships. ECF No. 1 at ¶ 43.

## III.    2015 TPP Program Funding

15.    In 2015, OAH announced a second round of five-year grants through the "2015 Tier 1 FOA" and "2015 Tier 2 FOA," (collectively the "2015 FOAs"). Ex. 6 at 3. The 2015 FOAs were further divided into Tier 1A/1B and Tier 2A/2B/2C grants to provide more guidance to applicants and emphasize particular areas of need. *See id.*

16.    For example, the 2015 Tier 1B FOA directed applicants to choose an "evidence-based TPP program[] eligible for replication," which was defined as "a program that had shown evidence of effectiveness as part of the TPP Evidence Review and had been "assessed by the HHS TPP Evidence Review as being implementation ready, meaning that the program has clearly defined curricula and components, necessary staff supports and training, and specified guidelines and tools for monitoring fidelity." Ex. 6 at 11–12.

17.    The 2015 Tier 1B FOA further "required [grantees] to implement evidence-based TPP programs with fidelity and quality" (Ex. 6 at 21) and awarded points to grantees based on, among other things, the "extent to which the applicant's plans for monitoring fidelity and managing adaptations are likely to result in implementation of evidence-based TPP programs with fidelity" as well as the applicant's experience "implementing evidence-based TPP programs on a large scale (i.e., at least 500 youth per year)" and in the target communities. Ex. 6 at 73, 74. Applicants were also awarded points based on the extent to which their programs were culturally inclusive and non-stigmatizing for all teens. Ex. 6 at 53, 73.

18.    Final award decisions for the 2015 FOAs were to be made by the OAH Director. Ex. 6 at 77; Ex. 7 at 79.

19.     In July 2015, following a competitive grant application process, HHS awarded 81 new five-year TPP Program grants. *See* Ex. 20.

**IV.   Ms. Huber's Pre-Administration Focus on Abstinence-Only Sexual Education**

20.     Prior to joining the Trump Administration, Ms. Huber served as the Executive Director of the National Abstinence Education Association ("NAEA") (now Ascend) from 2007 to 2017, a trade association for abstinence-only organizations.  *See* Valerie Huber, *From First Blush to Sexual Chaos*, YouTube (Mar. 3, 2015), www.youtube.com/watch?v=b8orU7_ISKM.

21.     Ms. Huber has stated that her organization "rebranded" abstinence-only education as "sexual risk avoidance" ("SRA") education. *Id.* at approx. 58:30-59:05 ("[W]e are moving away from the word abstinence. ... [W]e're actually in the process of rebranding even our organization.").

22.     SRA education focuses on "optimal health" and defines "optimal health behavior" as abstaining from all sexual activity outside of marriage and "cessation" as ceasing all sexual activity if already sexually active. *See, e.g.*, Ex. 10 at 13 (defining "optimal health outcome" as "wait[ing] for marriage before engaging in sex"); *id.* at 38 ("The optimal health outcome is sexual delay, preferably until marriage."). As NAEA explained, "SRA education is built on the premise that all non-marital teen sexual activity is high-risk behavior" and therefore focuses on "voluntarily refraining from all sexual activity, including, but not limited to sexual intercourse." *Id.* at 10 (emphasis omitted). In an SRA program, "all themes and topics within the program [must] encourage and empower teens to choose or regain a lifestyle that avoids all sexual risk." *Id.* at 37.

23.     The June 2012 NAEA report also contrasts programs incorporating SRA principles and optimal health goals with programs the NAEA calls "sexual risk reduction," but which Plaintiff refers to as "comprehensive sex education."  *Id.* at 3, 5, 19; *see also, e.g.*, Ex. 11

6

at 5 (defining "'[c]omprehensive' sex education" as a "[r]isk reduction approach" often used as a synonym for "pregnancy prevention"). According to Ms. Huber's organization, these programs "normalize[] teen sex, and put[] the emphasis on reducing the risk, rather than eliminating it," making them incompatible with SRA principles. Ex. 12 at 2. For that reason, NAEA concluded, "[y]ou can't blend the two." *Id.* Consistent with these themes, NAEA asked Congress to "place a clear and unquestionable priority on sexual risk avoidance."  Ex. 10 at 2.  *See, e.g.*, Ex. 10 at 2 ("Discontinue federal funding for any programs that compromise teen health by normalizing sexual activity outside of marriage."); *id.* at 37 ("Any program that perpetuates the view that sexual experimentation is an acceptable risk behavior for teens should receive no taxpayer funds.").

24.    In a December 10, 2009 letter sent to several members of Congress, Ms. Huber stated her "strong opposition to" Congress's "funding for a new Teenage Pregnancy Prevention (TPP) program" because it did not "place heavy emphasis on risk avoidance." *See* Ex. 13 at 1.

## V.    Defendants' Administration of the TPP Program Since 2017

25.    In a March 2017 email, Ms. Huber continued to advocate for abstinence-only education by directly meeting with HHS employees, including Laura Trueman and Steven Valentine.  *See* Declaration of Benjamin Link ("Link Decl.") Ex. 1; Link Decl. Ex. 2. In documents that Ms. Huber provided before a meeting with HHS officials, she opined that the TPP Program and OAH were "[u]nnecessary from the start, except to drive a harmful agenda that normalizes teen sex and a false 'evidence based' narrative," and therefore "should be immediately abolished." Link Decl. Ex. 2 at 8. In one document, she asserted that "evidence based programs" were a "[m]yth," and "the entire effort was a sham." *Id.* at 8, 9. In another, she argued "[h]arm reduction programs still place youth at risk and should be replaced" and that the

TPP Program is a "radical approach" that is a "funding stream for Planned Parenthood and other pro-teen-sex groups." Link Decl. Ex. 1 at 3, 7.

26.     Ms. Huber, asked HHS to "immediately halt the TPP program and redirect funds back to the risk avoidance message, from whence they came. The TPP program should be ended, restoring the funds to SRA programs." Link Decl. Ex. 2 at 8; *see also* Link Decl. Ex. 1 at 4 ("Defund the *Teen Pregnancy Prevention (TPP) Program* and restore this funding to SRA programs.").

27.     Ms. Huber met with HHS officials on or about March 8, 2017, with a "time sensitiv[e]" request to "immediately halt" the TPP Program. Link Decl. Ex. 2 at 2, 8.

28.     In or before May 2017, HHS submitted a budget that proposed to "eliminate[] the TPP program." Ex. 14 at 6.  The Congressional Justification associated with the budget request stated: "The FY 2018 President's Budget request is $0.00, a decrease of $100,808,000 from the FY 2017 Annualized CR. The Budget eliminates the TPP program. The teenage pregnancy rate has declined significantly over recent years, but it does not appear this program has been a major driver in that reduction." *Id.*  Congress did not eliminate program funding.

29.     In late May 2017, OAH approved year-three continuation grants to "89 [TPP Program] grantees, one Secretary's Minority AIDS Initiative grantee, and three Pregnancy Assistance Fund . . . grantees." *See* Link Decl. Ex. 3 at 1-2.

30.     On June 5, 2017, Ms. Huber was appointed Chief of Staff in the Office of the Assistant Secretary of Health ("OASH") at HHS, which oversees OAH and the TPP Program. Ms. Huber was subsequently named Senior Policy Advisor for OASH. In that position, her portfolio included OAH and the TPP Program, both of which she has long sought to abolish.

31.     In July 2017, HHS notified 81 grantees that that their grants would be terminated as of June 30, 2018. This termination shortened their five-year grants by two years and occurred outside the usual budget process.  Link Decl. Ex. 4.

32.     OAH staff were not involved in the decision and the grantees were given no reason for the terminations. *See, e.g.*, Link Decl. Ex. 4 at 2 ("OAH has not been part of the discussions. . . . I reminded him that OAH were not aware of the grant action until the last minute . . . .").

33.     Internal OAH staff correspondence warned that HHS statements to the press regarding the rationale for grant termination were inaccurate.  For example, in an article published in the *New York Times* on July 25, 2017, an HHS spokesman was quoted as stating that HHS's evaluation of the TPP grantees showed the "only four of 37 programs studies showed positive lasting effects."   OAH Director Evelyn Kappeler described this statement as a clear "error," and offered to provide accurate data to others at HHS.  *See* Link Decl. Ex. 5 at 3-5.

34.     On March 23, 2018, while litigation regarding the early termination of TPP Program grants was pending, Congress enacted the Consolidated Appropriations Act, 2018, Pub. L. No. 115-141, 132 Stat. 348, 733 (2018) ("2018 CAA").

35.     The 2018 CAA provides $101 million for making "competitive contracts and grants to public and private entities to fund medically accurate and age appropriate programs that reduce teen pregnancy and for the Federal costs associated with administering and evaluating such contracts and grants."  *Id.*

36.     The 2018 CAA provides that "not more than 10 percent of the available funds shall be for training and technical assistance, evaluation, outreach, and additional program support activities[.]"  *Id.*

37.     The 2018 CAA provides that 75% of the remaining funds "shall be for replicating programs that have been proven effective through rigorous evaluation to reduce teenage pregnancy, behavioral risk factors underlying teenage pregnancy, or other associated risk factors[.]" *Id.*

38.     The statute reserved the remaining 25% "for research and demonstration grants to develop, replicate, refine, and test additional models and innovative strategies for preventing teenage pregnancy:" Id.   The statute also provided for the continued funding of the TPP Evidence Review.   *Id.* ("$6,800,000 shall be available to carry out evaluations (including longitudinal evaluations) of teenage pregnancy prevention approaches[.]").

39.     On April 19, 2018, the United States District Court for the District of Columbia vacated "HHS's decision to shorten the project period" by terminating TPP Program grants and ordered, "HHS shall accept and process Plaintiffs' applications as if it had not terminated the Plaintiffs' federal awards." Additional courts also enjoined HHS from terminating these grants.[2]

40.     On April 20, 2018, OAH issued a Funding Opportunity Announcement ("FOA") titled "Announcement of Availability of Funds for Phase I Replicating Programs (Tier 1) Effective in the Promotion of Healthy Adolescence and the Reduction of Teenage Pregnancy and Associated Risk Behaviors" ("2018 Tier 1 FOA"), and an FOA titled "Announcement of the Availability of Funds for Phase I New and Innovative Strategies (Tier 2) to Prevent Teenage Pregnancy and Promote Healthy Adolescence" ("2018 Tier 2 FOA").   *See* Ex. 1; Ex. 2,

---

[2] *See Planned Parenthood of Greater Wash. & N. Idaho v. HHS*, No. 18-cv-55, 2018 WL 1934070, at *1-2 (E.D. Wash. Apr. 24, 2018), *appeal filed* June 25, 2018*; Healthy Teen Network v. Azar*, No. 18-cv-468, 2018 WL 1942171, at *1-4 (D. Md. Apr. 25, 2018), *appeal filed* June 22, 2018; *Policy & Research, LLC v. HHS*, -- F. Supp. 3d ---, 2018 WL 2184449, at *2-5 (D.D.C. May 11, 2018), *appeal filed* June 15, 2018; *King Cnty. v. Azar*, No. 18-cv-242*, 2018 WL 2411759, at *6 (W.D. Wash. May 29, 2018); *Healthy Futures of Tex. v. HHS*, No. 18-cv-992, 2018 WL 2471266 (D.D.C. June 1, 2018).

respectively.  A detailed comparison of the 2018 Tier 1 FOA to the 2015 Tier 1B FOA, as well as the 2018 Tier 2 FOA to the 2015 Tier 2B FOA, is included hereto in Appendix A.

41.     The 2018 Tier 1 FOA does not require that the applicant replicate programs that have been "rigorously evaluated and proven effective[.]"  The 2018 Tier 1 FOA states that "Effective Programs Eligible for Replication" will "replicate one of the two effective programs": the "Center for Relationship Education's Systematic Method for Assessing Risk-Avoidance Tool" (or "SMARTool") or the "Tool to Assess the Characteristics of Effective Sex and STD/HIV Education Programs" (or "TAC"). *See* Ex. 1 at 12, 35 and Ex. 2 at 11. Neither "tool" states that it is a program.  The 2018 Tier 1 FOA also states that "[c]urriculum must be selected, *with necessary adaptations made* . . . to address and replicate each of the elements in one of the two programs." Ex. 1 at 12.

42.     Further, the 2018 Tier 1 FOA states that, in addition to the requirement that recipients replicate one of two "tools," each applicant "should then describe how they will also emphasize priorities that comport with public health protocols for addressing negative risk behaviors." *Id.* at 14.

43.     The 2018 Tier 2 FOA also requires that applicants select either the SMARTool or the TAC as a "program" for implementation.  Neither SMARTool nor TAC constitutes an educational program to be implemented directly.

44.     Further, like the 2018 Tier 1 FOA, the 2018 Tier 2 FOA requires applicants to adapt any program to be consistent with the defined OAH "Public Health Priorities."  *See* Ex. 2 at 12.

45.     These "Public Health Priorities for Implementation" include

          a. "Weaving the goal of optimal health into every component of the project."

b. "Clearly communicate risk. Projects will clearly communicate that teen sex is a risk behavior for both the physical consequences of pregnancy and sexually transmitted infections; as well as sociological, economic, and other related risks. The CDC considers teen sex to be a risk behavior, together with other risk behaviors, such as drug use, lack of physical activity, and failing to use a seatbelt when riding in a car."

c. "Providing cessation support. In addition, recipients will provide affirming and practical skills for those engaged in sexual risk to make healthier and risk-free choices in the future, thereby improving the chances for achieving optimal health outcomes."

Ex. 1 at 15-16; *see also* Ex. 2 at 12-13.

46.     These "Public Health Priorities" are consistent with the SRA, or abstinence only education, advocated by Ms. Huber as Executive Director of NAEA.

47.     In approximately June 2018, HHS again submitted a budget that eliminates the TPP program.  The Congressional Justification associated with the budget states: "The FY 2019 President's Budget request does not include funds for this program. Teenage pregnancy rates have declined precipitously over recent decades. The pregnancy rate for 15-19 year-olds has declined by nearly two thirds from its peak rate in 1990.  This trend in declining pregnancy rates existed before the TPP program. TPP does not appear to have been a major driver in teenage pregnancy reductions. TPP serves less than one percent of teenagers in the United States."  Ex. 21 at 6.

## VI.     TPP Program Funding of PPNYC, 2010-2018

48.     Beginning in 2010, OAH awarded PPNYC a five-year Tier 1 TPP program grant of $611,823, annually.  Barnette Decl. Ex. C.  PPNYC used this funding to provide the Making Proud Choices! curriculum in schools, after-school programs, and community-based organizations in Manhattan, Bronx, and Brooklyn.  The Making Proud Choices! program was on

the "List of Evidence-based Program Models" included in the 2010 Tier 1 FOA.  Ex. 3 at Appendix A.

49.     In 2013, OAH granted PPNYC an additional one-year supplemental grant of $262,541 to expand its Making Proud Choices! programming into Queens.  PPNYC used OAH's funding to replicate the evidence-based Making Proud Choices! program.

50.     In 2015, PPNYC submitted an application for Tier 1B funding to OAH.  Though PPNYC was not selected as a TPP Program grantee by OAH in 2015 under the second round of grants, it has continued to use and seek alternative funding for the facilitation of evidence-based programs.

51.     Since 2016, PPNYC has received annual funding of its Capacity Building for Foster Care (CB4FC) program as a sub-grantee of the Texas A&M University's Integrating Teen Pregnancy Prevention Innovative Practices (iTP3) project, which was funded under the 2015 FOA for Tier 2A funding.  Barnette Decl. Exs. I and J.

## VII.   Congressional Funding of Abstinence Only Education Through Separate Funding Sources.

52.     From 1980 to 2009, federal funding for sexual education was focused almost exclusively on programs that taught abstinence from all sexual activity as the "expected standard for all school age children."   These "abstinence only education" programs taught that any "sexual activity outside of the context of marriage is likely to have harmful psychological and physical effects." *E.g.*, 42 U.S.C. § 710.  When Congress created such programs, grantees were not required to provide evidence of the efficacy of their programs to receive federal funding. *See, e.g., id.*

53.     Each year since 2012, and continuing with the 2018 CAA, Congress has explicitly separately funded abstinence-only grants at approximately the same level as funding for

13

evidence-based programs. One such abstinence-only program was originally named the "Competitive Abstinence Education Grant Program" and then renamed the "Sexual Risk Avoidance Education Program" ("SRAEP") in FY16.   *See* Consolidated Appropriations Act, 2017, Pub. L. No. 115-31, 131 Stat. 135, 536 (May 5, 2017).

54.     In the 2018 CAA, Congress set aside $25 million for the SRAEP—competitive grants "which exclusively implement education in sexual risk avoidance (defined as voluntarily refraining from non-marital sexual activity)." 2018 CAA, 132 Stat. at 736.

55.     Separately, Congress has also provided an additional $75 million for the Title V State Abstinence Education Grant Program for both FY 2018 and FY 2019. *See* 42 U.S.C. § 710. That funding remains in place.

Dated: New York, New York             Respectfully submitted,
      July 24, 2018

                                    By:    /s/ Marcus A. Asner

Carrie Y. Flaxman (pro hac vice)             Marcus A. Asner
Richard Muniz (pro hac vice)                 Ada V. Añon
PLANNED PARENTHOOD                           Alice C.C. Huling
FEDERATION OF AMERICA                        ARNOLD & PORTER KAYE SCHOLER LLP
1110 Vermont Ave, NW, Suite 300              250 West 55th Street
Washington, DC 20005                         New York, New York 10019
(202) 973-4800                               (212) 836-8000
carrie.flaxman@ppfa.org                      marcus.asner@arnoldporter.com
richard.muniz@ppfa.org                       ada.anon@arnoldporter.com
                                         alice.huling@arnoldporter.com

                                         Drew A. Harker (*pro hac vice*)
                                         ARNOLD & PORTER KAYE SCHOLER LLP
                                         601 Massachusetts Avenue, NW
                                         Washington, DC 20001
                                         (202) 942-5000
                                         drew.harker@arnoldporter.com

                                         Attorneys for Plaintiff Planned Parenthood
                                         of New York City, Inc.

# APPENDIX A

**Comparison of 2015 Tier 1B FOA to the 2018 Tier 1 FOA**

| 2015 Tier 1B FOA | 2018 Tier 1 FOA |
|---|---|
| Requires applicants to replicate programs that have been proven effective through rigorous evaluation to reduce teenage pregnancy, behavioral risk factors underlying teenage pregnancy, or other associated risk factors.  2015 Tier 1B FOA[1] at 11–12. | Does not require applicants to replicate programs that have been proven effective through rigorous evaluation. |
| Uses the term "evidence-based" multiple times.  *See, e.g.*, 2015 Tier 1B FOA at pp. 3, 4, 5, 6, 11, 12. | The phrase "evidence-based" does not appear at all. The term "evidence" is not used with regards to replicating programs; it is only used with respect to the collecting of evidence within the funded project itself.  *See* 2018 Tier 1 FOA[2] at 22–23. |
| Defines "Evidence-Based Teen Pregnancy Prevention Programs" as "[p]rograms identified by HHS as having undergone a rigorous evaluation been shown to be effective at preventing teen pregnancies, sexually transmitted infections, and/or sexual risk behaviors."  2015 Tier 1 FOA at p. 89. The FOA identifies the programs contained on the TPP Evidence Review as "Evidence-Based Teen Pregnancy Prevention Programs." *Id.* at 92. | Provides no definition of "Evidence-Based Teen Pregnancy Prevention Programs."  The words "proven" and "rigorous evaluation" only appear when describing evaluations to be conducted *after* the programs are funded. 2018 Tier 1 FOA at 19. |

---

[1] Declaration of Drew Harker ("Harker Dec.") Ex. 6.

[2] Harker Dec. Ex. 2.

| 2015 Tier 1B FOA | 2018 Tier 1 FOA |
|---|---|
| Refers to the HHS TPP Evidence Review multiple times in setting forth which evidence-based TPP programs are eligible for replication. *See, e.g.*, 2015 Tier 1B FOA at 11. Requires applicants to choose a program on the TPP Evidence Review to implement and maintain fidelity to the program being implemented. *Id.* at 21–22. | Does not refer to HHS's TPP Evidence Review. Instead, requires applicants to utilize two "programs," the Center for Relationship Education's Systematic Method for Assessing Risk-avoidance Tool ("SMARTool") and the "Tool to Assess the Characteristics of Effective Sex and STD/HIV Education Programs ("TAC"). 2018 Tier 1 FOA at 12–13. |
| Provides a list of programs on the TPP Evidence Review in an appendix to the FOA. *See* Appendix D of 2015 Tier 1B FOA. | Provides a list of "elements" for both the SMARTool and the TAC. 2018 Tier 1 FOA at 12–13. With regards to the two "programs," applicants are only required to replicate each *element* of one of the two programs. *Id.* at 14. |
| Does not require applicants to include any specific information or concepts, so long as applicants are replicating the chosen program with fidelity. *See* 2015 Tier 1B FOA at 21–23. Significant changes to the program content could compromise a program's fidelity "and thus might affect the intended outcomes." *Id.* at 23. | Requires applicants to, beyond the "replication" of the elements of the "program" chosen, implement additional expectations. 2018 Tier 1 FOA at 14. |
| No alterations to TPP Evidence Review Programs or content are required. | Applicants must "weav[e] the goal of optimal health into every component of the project." 2018 Tier 1 FOA at 14. The FOA does not provide a definition of "optimal health" except to say that it is "a term that refers to the best possible outcomes for an individual's physical, emotion and social health." *Id.* at 86. |

| 2015 Tier 1B FOA | 2018 Tier 1 FOA |
|---|---|
| No alterations to TPP Evidence Review Programs or content are required. | Applicants must "provide  skills to *avoid* sexual risk."  2018 Tier 1 FOA at 15 (emphasis added).  "Providers should therefore place a ***priority*** on providing information and practical skills to assist youth in ***successfully avoiding sexual risk*,*" which is defined as "engaging in any behavior that increases one's risk for any of the unintended consequences of sexual activity." *Id.* at 15–16. (emphasis added). |
| No alterations to TPP Evidence Review Programs or content are required. | Applicants must provide "cessation support."  2018 Tier 1 FOA at 16. Applicants must provide skills "for those engaged in sexual risk to make healthier and ***risk-free choices*** in the future…." *Id.* |
| Final award decisions will be made by the Director of the Office of Adolescent Health.  2018 Tier 1B FOA at 77. | Final award decisions will be made by the Director of the Office of Adolescent Health, "in consultation with the Assistant Secretary for Health."  2018 Tier 1 FOA at 63. |
| Allocates up to 30 points for an application's Program Approach, with particular value placed on the project's implementation of evidence-based programming and fidelity to such programming.  2015 Tier 1B FOA at 72–73. | Provides 25 points for replication of "effective elements" in the two "programs" ***and*** the application of "general expectations" regarding "optimal health," "communicating of risk," "skills to avoid risk," and "cessation support." |
| Relies upon the scientifically determined cognitive and social development of young people at various ages to define the term "Age Appropriate." 2015 Tier 1B FOA at 89. | Allows the grantee to determine what is or is not "age appropriate" for young people.  2018 Tier 1 FOA at 23–24 ("Recipients are expected to conduct their own review of all materials to ensure they are…age appropriate…."). No scientific evidence or third party analysis is necessary for such determination. |

| 2015 Tier 1B FOA | 2018 Tier 1 FOA |
|---|---|
| Requires applicants to ensure that "program materials are medically accurate, age appropriate, culturally and linguistically appropriate, and inclusive of Lesbian, Gay, Bisexual, Transgender, and Questioning (LGBTQ) youth," and provides that OAH will conduct a review for medical accuracy before an applicant can use any materials. 2015 Tier 1B FOA at pp. 23–24. | Provides that materials are "expected" to be "medically accurate, age appropriate, culturally and linguistically appropriate, and trauma-informed." 2018 Tier 1 FOA at pp. 23–24. Applicants must "certify that all materials are medically accurate prior to use," but OAH will no longer review for medical accuracy unless "deemed necessary." Id. at 24. Omits any reference to LGBTQ youth. |
| Defines "Medical Accuracy" as "[v]erified or supported by the weight of research conducted in compliance with accepted scientific methods; and published in peer-reviewed journals, where applicable or comprising information that leading professional organizations and agencies with relevant expertise in the field recognize as accurate, objective, and complete." 2015 Tier 1B FOA at p. 90. | Defines "Medically Accurate" as "information [that] will be referenced to peer reviewed publications by educational, scientific, governmental, or health organization." 2018 Tier 1 FOA at 23. Information is not required to be "supported by the weight" of scientific evidence, but merely "referenced" to evidence. Id. |

4

**Comparison of 2015 Tier 2B FOA to the 2018 Tier 2 FOA**

| 2015 Tier 2B FOA | 2018 Tier 2 FOA |
|---|---|
| Provides no requirements of substantive content or programming. | Requires applicants to address key elements of the SMARTool or the TAC. 2018 Tier 2 FOA[3] at 11. |
| Provides no requirements of substantive content or programming. | Applicants must "weav[e] the goal of optimal health into every component of the project." 2018 Tier 2 FOA at 12. The FOA does not provide a definition of "optimal health" except to say that it is "a term that refers to the best possible outcomes for an individual's physical, emotion and social health." *Id* |
| No alterations to TPP Evidence Review Programs or content are required. | Applicants must "provide  skills to *avoid* sexual risk." 2018 Tier 2 FOA at 13 (emphasis added).  "Providers should therefore place a *priority* on providing information and practical skills to assist youth in *successfully avoiding sexual risk*," which is defined as "engaging in any behavior that increases one's risk for any of the unintended consequences of sexual activity." *Id.* at 13. (emphasis added). |
| No alterations to TPP Evidence Review Programs or content are required. | Applicants must provide "cessation support." 2018 Tier 2 FOA at 13. Applicants must provide skills "for those engaged in sexual risk to make healthier and *risk-free choices* in the future…." *Id.* |
| Final award decisions will be made by the Director of the Office of Adolescent Health.  2015 Tier 2B FOA[4] at 79. | Final award decisions will be made by the Director of the Office of Adolescent Health, "in consultation with the Assistant Secretary for Health."  2018 Tier 2 FOA at 56. |

---

[3] Harker Dec. Ex. 2.

[4] Harker Dec. Ex. 7.

5

| 2015 Tier 2B FOA | 2018 Tier 2 FOA |
|---|---|
| Does not allocate any points for substantive content or programming. Allocation of points is based on clarity of description, innovativeness, feasibility, scientific support, work plan, and design plan.  *See* 2015 Tier 2B FOA at 71–76. | Provides 30 points for "Project Approach and Alignment to Expectations and Priorities," including the extent to which the "proposed project and approach ***fully aligned*** with the priorities and ***expectations*** of this FOA."  2018 Tier 2 FOA at 53–54. |
| Relies upon the scientifically determined cognitive and social development of young people at various ages to define the term "Age Appropriate." 2015 Tier 2B FOA at 91. | Allows the grantee to determine what is or is not "age appropriate" for young people.  2018 Tier 2 FOA at 20–21 ("Recipients are expected to conduct their own review of all materials to ensure they are…age appropriate…."). No scientific evidence or third party analysis is necessary for such determination. |
| Requires applicants to ensure that "intervention materials are medically accurate, age appropriate, culturally and linguistically appropriate, and inclusive of Lesbian, Gay, Bisexual, Transgender, and Questioning (LGBTQ) youth," and provides that OAH will conduct a review for medical accuracy before an applicant can use any materials. 2015 Tier 2B FOA at pp. 20–21. | Provides that materials are "expected" to be "medically accurate, age appropriate, culturally and linguistically appropriate, and trauma-informed." 2018 Tier 2 FOA at pp. 20–21. Applicants must "self-certify all materials have been reviewed for medically accurate prior to use."" Id. at 21. Omits any reference to LGBTQ youth. |

| 2015 Tier 2B FOA | 2018 Tier 2 FOA |
|---|---|
| Defines "Medical Accuracy" as "[v]erified or supported by the weight of research conducted in compliance with accepted scientific methods; and published in peer-reviewed journals, where applicable or comprising information that leading professional organizations and agencies with relevant expertise in the field recognize as accurate, objective, and complete." 2015 Tier 2B FOA at p. 92.  OAH undertakes a medical review prior to use. *Id.* at 21. | Defines "medically accurate" as "information [that] will be referenced to peer reviewed publications by educational, scientific, governmental, or health organization."  2018 Tier 2 FOA at 20.  Information is not required to be "supported by the weight" of scientific evidence, but merely "referenced" to evidence. *Id.* |