UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------X
PLANNED PARENTHOOD OF NEW YORK CITY,
INC.,

                Plaintiff,        **MEMORANDUM AND ORDER**

       - against -         18 Civ. 5680 (NRB)

U.S. DEPARTMENT OF HEALTH AND HUMAN
SERVICES; ALEX MICHAEL AZAR, II, in
his official capacity as Secretary
of the U.S. Department of Health and
Human Services; VALERIE HUBER, in
her official capacity as Senior
Policy Advisor for the Office of the
Assistant Secretary for Health at
the U.S. Department of Health and
Human Services,

              Defendants.
----------------------------------X

**NAOMI REICE BUCHWALD**
**UNITED STATES DISTRICT JUDGE**

## I.   INTRODUCTION

    Plaintiff Planned Parenthood of New York City, Inc. ("PPNYC") challenges the issuance by the U.S. Department of Health and Human Services ("HHS") of two Funding Opportunity Announcements (the "2018 FOAs") that describe the terms whereby applicants can seek grant funding under the Teen Pregnancy Prevention ("TPP") Program. Plaintiff moves for summary judgment under Fed. R. Civ. P. 56(a), and seeks either a permanent injunction preventing defendants from implementing the FOAs or a preliminary injunction pursuant to Section 705 of the Administrative Procedure Act ("APA") and Fed. R. Civ. P. 65.  Defendants move to dismiss for lack of standing

1

under Fed. R. Civ. P. 12(b)(1), and cross-move for summary judgment.

The governing statute for the TPP Program establishes requirements for two tiers of grants:  Three-quarters of the funding is allotted to Tier 1 Grants, which are for "replicating programs that have been proven effective through rigorous evaluation to reduce teenage pregnancy."  The other quarter is designated for Tier 2 Grants to "develop, replicate, refine, and test additional models and innovative strategies for preventing teenage pregnancy."  Applications for both tiers of grants are solicited through FOAs.

Plaintiff has been the beneficiary of TPP funding since the Program's inception in 2010, but alleges that it is now ineligible for and can no longer compete for Tier 1 and Tier 2 grants as a result of new FOAS adopted by HHS that it contends are contrary to law and arbitrary and capricious.  We first address whether plaintiff has standing to challenge HHS's actions, and conclude that it does.  We then consider whether the matter is committed to agency discretion and therefore unreviewable, and conclude that it is not.  Next, we find that the adoption of the FOAs constitutes final agency action.

Having resolved these threshold issues, we turn to the merits. We hold that the 2018 Tier 1 FOA is contrary to the applicable statute because the evaluative tools that applicants for Tier 1

2

grants must "replicat[e]" are not "programs" and have not "been proven effective through rigorous evaluation." We reach a different conclusion as to the 2018 Tier 2 FOA because these tools and HHS's "public health priorities" are not inconsistent with Tier 2's statutory mandate to "test additional models and innovative strategies." Accordingly, we grant plaintiff's motion for summary judgment in part and permanently enjoin defendants from using the 2018 Tier 1 FOA as the basis for awarding or disbursing TPP Program funds, and grant defendants' motion for summary judgment as it relates to the 2018 Tier 2 FOA.

## II.   BACKGROUND

The relevant facts of this case are largely uncontested; we will note any facts in dispute.[1]

Since 2010, Congress has annually allocated funding to HHS for "grants to public and private entities to fund medically accurate and age appropriate programs that reduce teen pregnancy." Consolidated Appropriations Act, 2018, Pub. L. No. 115-141, 132 Stat. 348, 733 (2018) ("2018 CAA"); Consolidated Appropriations

---

[1]   The factual background is largely drawn from the Administrative Record ("AR"), Aug. 2, 2018, ECF No. 47; Complaint, June 22, 2018, ECF No. 1; Plaintiff's 56.1 Statement, ECF No. 35 ("56.1 Stmt."); and the declarations of Marcus A. Asner, Aug. 9, 2018, ECF No. 51; Margaret Barnette, July 31, 2018, ECF No. 39; Drew A. Harker, July 24, 2018, ECF No. 37; Leslie M. Kantor, Aug. 9, 2018, ECF No. 52; Benjamin Link, July 24, 2018, ECF No. 34; and Benjamin H. Torrance, Aug. 2, 2018, ECF No. 46, and attached exhibits.

Defendants did not submit a 56.1 Statement, explaining that doing so would be inconsistent with "its usual practice in APA cases" and "neither necessary nor appropriate." Defs.' Mem. of Law at 10 n.4, Aug. 2, 2018, ECF No. 49.

Act, 2010, Pub. L. No. 111-117, 123 Stat. 3034, 3253 ("2010 CAA"). After setting aside no more than 10 percent of this funding for training and administration, funds are allocated to two categories of TPP grants: (1) 75 percent of the remaining funding to Tier 1 grants "for replicating programs that have been proven effective through rigorous evaluation to reduce teenage pregnancy," and (2) 25 percent to Tier 2 grants for "research and demonstration grants to develop, replicate, refine, and test additional models and innovative strategies for preventing teenage pregnancy." 2018 CAA, 132 Stat. at 733. This statutory language has remained constant since 2010. See id.; 2010 CAA, 123 Stat. at 3253; see also Healthy Teen Network v. Azar, No. 18 Civ. 468 (CCB), 2018 WL 1942171, at *9 n.15 (D. Md. Apr. 25, 2018) ("[A]ll consolidated appropriations acts since the one passed in 2010 use the same language to fund the TPP program.").

HHS has solicited applications for TPP grants through FOAs, released in 2010, 2015, and as at issue here, 2018. The 2010 Tier 1 FOA identified 28 evidence-based programs that independent research by Mathematica Policy Research ("Mathematica") had shown to be effective.[2] 2010 Tier 1 FOA, Torrance Decl. Ex. A at 7, 38,

---

[2] From approximately 1,000 potentially relevant studies, Mathematica initially identified 28 programs with a documented, favorable, statistically significant impact on at least one sexual risk behavior or reproductive health outcome of interest (sexual activity, number of sexual partners, contraceptive use, STIs, or pregnancy). See Compl. ¶¶ 33-34; Br. of Members of Congress as Amici Curiae at 10, July 27, 2018, ECF No. 38-1.

ECF No. 46-1.  Applicants for Tier 1 funding were required to "maintain fidelity to the original evidence-based program model with minimal adaptations."  Id. at 8.  However, if a program made "[s]ignificant adaptations," applicants would have been required to apply under Tier 2.  Id.  Applicants' programs were obligated to replicate the "core components" of the curriculum and implement one of the 28 evidence-based programs.  Id.

The 2010 Tier 2 FOA called for applications "that propose to study a broad range of approaches to teenage pregnancy prevention," even if they had not previously been rigorously evaluated, with a particular focus on grants to programs "that clearly explain the potential to demonstrate evidence and which could eventually be replicated."  2010 Tier 2 FOA, Torrance Decl. Ex. B at 7-8, ECF No. 46-2.

In 2010, plaintiff was awarded a five-year Tier 1 grant of $611,823 annually to replicate one of the 28 evidence-based programs, "Making Proud Choices!," in schools, after-school programs, and community-based organizations in Manhattan, Brooklyn, and the Bronx.  Compl. ¶ 87; 56.1 Stmt. ¶ 48; Barnette Decl. ¶ 9, ECF No. 39; Barnette Decl. Ex. C, ECF No. 39-3.  In

---

Mathematica has continued to publish periodic "Evidence Reviews" of the program models selected for the TPP Program.  Compl. ¶¶ 33, 43, 51.  Until the 2018 FOAs, the programs eligible for replication under Tier 1 were drawn from the programs that had been proven effective according to Mathematica's Evidence Reviews.  Id. ¶¶ 46-47.  Mathematica's most recent Evidence Review brought the programs that met its criteria for evidence of effectiveness to 48.  Id. ¶ 51.

2013, plaintiff received $262,541 in supplemental funding to expand to Queens. Compl. ¶ 87; 56.1 Stmt. ¶ 49. Plaintiff represents that it targeted 37 low-income and high pregnancy rate zip codes and reached 6,200 young people over the course of this five-year grant. Compl. ¶ 87.

HHS issued its second set of FOAs in 2015, splitting Tier 1 into two parts. Tier 1A focused on "Capacity Building to Support Replication of Evidence-Based Teen Pregnancy Prevention Programs," while Tier 1B focused on "Replicating Evidence-Based Teen Pregnancy Prevention Programs to Scale in Communities with the Greatest Need." See Barnette Decl. Ex. E, ECF No. 39-5; Barnette Decl. Ex. F, ECF No. 39-6. The 2015 Tier 1B FOA listed 36 evidence-based programs that had been designated as implementation ready and eligible for replication. 2015 Tier 1B FOA at 95-100, Barnette Decl. Ex. F at 98-103, ECF No. 39-6. In order to qualify, these programs needed to "1. Have been identified as having evidence of effectiveness by the HHS TPP Evidence Review . . . **and** 2. Have been assessed by the HHS TPP Evidence Review as being implementation ready, meaning that the program has clearly defined curricula and components, necessary staff supports and training, and specified guidelines and tools for monitoring fidelity." Id. at 14-15.

Tier 2 was split into three sub-categories under the 2015 FOAs[3]: (1) Supporting and Enabling Early Innovation to Advance Adolescent Health and Prevent Teen Pregnancy (Tier 2A); (2) Rigorous Evaluation of New or Innovative Approaches to Prevent Teen Pregnancy (Tier 2B); and (3) Effectiveness of TPP Programs Designed Specifically for Young Males (Tier 2C). See Tier 2B FOA at 3, Torrance Decl. Ex. D at 6, ECF No. 46-5. The stated purpose of these Tier 2 FOAs was "to increase the number of evidence-based TPP interventions available by rigorously evaluating new or innovative approaches" and to "expand[] the evidence base for the field of TPP by funding rigorous evaluations of innovative interventions designed to address gaps in the existing evidence." Id. at 6-7.

In 2015, plaintiff submitted an application for Tier 1B funding, but was not selected as a grantee. 56.1 Stmt. ¶ 50; Barnette Decl. ¶ 14, ECF No. 39. However, since 2016, plaintiff has received annual funding as a sub-grantee of Texas A&M University's Integrating Teen Pregnancy Prevention Innovative Practices project, which had been awarded a Tier 2A grant. 56.1

---

[3]   The Complaint omits mention of Tier 2C, but plaintiff's later briefing acknowledges that there were five tiers of funding in the 2015 FOAs, not four. Compare Compl. ¶¶ 45-46 (discussing only Tiers 2A and 2B), with 56.1 Stmt. ¶ 15 ("The 2015 FOAs were further divided into Tier 1A/B and Tier 2A/2B/2C grants to provide more guidance to applicants and emphasize particular areas of need.").

Stmt. ¶ 51; Barnette Decl. ¶ 15, ECF No. 39; Barnette Decl. Ex. I, ECF No. 39-9; Barnette Decl. Ex. J, ECF No. 39-10.

Plaintiff represents that the current administration has taken several steps to "dismantle" the TPP Program.  Compl. ¶¶ 54-64.  First, in May 2017, HHS's proposed budget sought to eliminate all funding for the the TPP Program.  Compl. ¶ 55 (citing HHS, General Departmental Management Budget at 91, https://www.hhs.gov/sites/default/files/combined-general-department management.pdf).  On March 23, 2018, however, Congress allocated $101 million to the TPP Program in the 2018 CAA.  Compl. ¶ 62. Second, in July 2017, HHS announced that it would be terminating all TPP Program grants in June 2018, two years before their scheduled end date.  Compl. ¶ 61.  Various grantees filed four separate lawsuits, each of which was resolved in their favor.  Id. (citing Planned Parenthood of Greater Wash. & N. Idaho v. HHS, No. 18 Civ. 55 (TOR), 2018 WL 1934070, at *1-2 (E.D. Wash. Apr. 24, 2018); King Cty. v. Azar, No. 18 Civ. 242 (JCC), 2018 WL 2411759, at *7-8 (W.D. Wash. May 29, 2018); Pol'y & Research, LLC v. HHS, No. 18 Civ. 346 (KBJ), 2018 WL 2184449, at *2-5 (D.D.C. May 11, 2018); Healthy Teen Network v. Azar, No. 18 Civ. 468 (CCB), 2018 WL 1942171, at *1-4 (D. Md. Apr. 25, 2018)).

On May 8, 2018, HHS issued the 2018 FOAs, the subject of this lawsuit.  See TPP FY 18 Tier 1 FOA at AR000111; TPP FY Tier 2 FOA at AR000199.  The Tier 1 FOA "solicit[s] applications . . . to

replicate and scale up one of two programs that include the protective factors shown to be effective in preventing teen pregnancy and/or sexual risk behaviors with youth." TPP FY 18 Tier 1 FOA at AR000034. The two referenced "programs" are the Tool to Assess the Characteristics of Effective Sex and STD/HIV Education Programs (the "TAC") and the Systematic Method for Assessing Risk-Avoidance Tool (the "SMARTool"). Id. at AR000034-35. Applications under the FOA "are required to replicate a risk avoidance model or a risk reduction model that incorporates the common characteristics outlined in one of the two programs." TPP FY 18 Tier 1 FOA at AR000035. Applicants for Tier 1 funding must "describe in detail how they will replicate each element" of the SMARTool or the TAC, id. at AR000045, and the Tier 2 FOA similarly requires applicants to "describe in detail how they implement protective factors and/or either elements from the SMARTool or the [TAC]," TPP FY18 Tier 2 FOA at AR000137. Neither the SMARTool nor the TAC defines a curriculum; rather, "[c]urriculum [sic] must be selected, with necessary adaptations made – or supplementary materials presented in tandem with an established curriculum – to address and replicate each of the elements" in the SMARTool or the TAC. TPP FY18 Tier 1 FOA at AR000043.

The SMARTool "describes 9 elements essential for effective
sexual risk avoidance[4] . . . :  (1) enhance knowledge of physical
development  and  sexual  risks  and  personal  relationships,
(2) support personal attitudes and beliefs that value sexual risk
avoidance, (3) acknowledge and address common rationalizations for
sexual activity, (4) improve perception of and independence from
negative peer and social norms, (5) build personal competencies
and self-efficacy to avoid sexual risk, (6) strengthen personal
intention and commitment to avoid sexual activity, (7) identify
and reduce the opportunities for sexual activity, (8) strengthen
future goals and opportunities, and (9) partner with parents."
Id. at AR000043 (emphasis added).

Likewise, the TAC "describes 17 elements of effective sexual
risk reduction[5] projects . . . :  (1) involved multiple people with

---

[4]   Defendants state that "programs that promote abstinence" are "the most
commonly discussed form of sexual risk avoidance," Defs.' Mem. of Law at 7,
Aug. 2, 2018, ECF No. 49, while plaintiff asserts that abstinence-only education
has been "rebrand[ed]" as "sexual risk avoidance," Compl. ¶ 58 (citing Mark
Peters, Euphemism:  Sexual Risk Avoidance, Boston Globe, June 23, 2017,
https://www.bostonglobe.com/ideas/2017/06/23/euphemism-sexual-risk-
avoidance/cowYjFTOcIS7hmD0wtm64O/story.html); see also Barnette Decl. ¶ 20
(stating "risk avoidance (also known as abstinence-only until marriage
programs")").  The SMARTool itself uses sexual risk avoidance and abstinence
education interchangeably. See The Center for Relationship Education, "SMARTool
– Systematic Method for Assessing Risk-avoidance Tool" ("SMARTool") at AR001831,
AR001833, AR001839.

[5]   The parties agree that plaintiff's programs are sometimes characterized
as "sexual risk reduction programs."  Defs.' Mem. of Law at 27, Aug. 2, 2018,
ECF No. 49; Compl. ¶ 90 ("PPNYC's evidence-based, sexual risk reduction
programming . . . ."); Barnette Decl. ¶ 20, ECF No. 39 ("[R]isk reduction (what
proponents of abstinence-only until marriage program [sic] call programs like
ours).").  Plaintiff prefers to describe this approach as "comprehensive sex
education."  Compl. ¶¶ 60, 78, 84; 56.1 Stmt. ¶ 23; Pl.'s Mem. of Law at 4-5,
July 24, 2018, ECF No. 36.

different backgrounds; (2) assessed relevant needs and assets of the target group; (3) used a logic model approach to develop the curriculum that specified the health goals, behaviors affecting the health goals, risk and protective factors affecting those behaviors, and activities addressing the risk and protective factors; (4) designed activities consistent with community values and available resources; and (5) pilot-tested the project; that the contents of the curriculum (6) focused on clear health goals; (7) focused narrowly on specific behaviors leading to the health goals, gave clear messages about the behaviors, and addressed situations that might lead to them and how to avoid them; (8) addressed multiple sexual psychosocial risk and protective factors affecting sexual behaviors; (9) created a safe social environment for youth to participate; (10) included multiple activities to change each of the selected risk and protective factors; (11) employed instructionally sound teaching methods that actively involved the participants, helped them personalize the information, and were designed to change risk and protective factors; (12) employed activities, instructional methods and behavioral messages that were appropriate to the youths' culture, developmental age, and sexual experience; and (13) covered topics in a logical sequence; and that the implementation of the curriculum (14) secured at least minimal support from appropriate authorities, (15) selected educators with desired characteristics,

trained them, and provided monitoring, supervision, and support; (16) if needed, implemented activities to recruit and retain youth and overcome barriers to their involvement; and (17) implemented virtually all activities with reasonable fidelity." Id. at AR000043-44 (emphasis added).

All applicants for both tiers of funding must also describe how they will emphasize HHS's "public health priorities," including that they promote the goal of "optimal health," "clearly communicate that teen sex is a risk behavior," "place a priority on providing information and practical skills to assist youth in successfully avoiding sexual risk," and "provide cessation support . . . for those engaged in sexual risk." Id. at AR000044-46.

The 2018 FOAs call for an independent review panel to evaluate, comment on, and score applications, and the Director of the Office of Adolescent Health to make final award selections to be recommended to the Grants Management Officer for risk analysis. Id. at AR000093-94; TPP FY Tier 2 FOA at 182-83. Once these selections are made, the FOAs provide that "[a]ll award decisions, including level of funding if an award is made, are final and you may not appeal." TPP FY Tier 1 FOA at AR000094; TPP FY 18 Tier 2 FOA at AR000183. Both 2018 FOAs requested non-binding letters of intent by May 21, 2018 and applications by June 29, 2018. TPP FY 18 Tier 1 FOA at AR000032-33; TPP FY 18 Tier 2 FOA at AR000127-

12

28.  HHS represents that under the 2018 FOAS, it will issue grants no earlier than September 5, 2018, and that September 30, 2018 is its fiscal year deadline to obligate funds.  Defs.' Mem. of Law at 3, Aug. 2, 2018, ECF No. 49.

Plaintiff took part in initial informational calls with HHS regarding TPP Program funding and corresponded with HHS's "Tier 2 FOA Team" regarding specific requirements of applying under the 2018 FOAs.  Barnette Decl. ¶ 23, ECF No. 39; Barnette Decl. Ex. M, ECF No. 39-13.  Plaintiff decided not to apply for funding, representing that it takes significant resources to complete applications and that it cannot compete for funding under these FOAs.  Barnette Decl. ¶¶ 41-50, ECF No. 39.

On June 22, 2018, one week before applications for funding under the 2018 FOAs were due, PPNYC filed this lawsuit.  Compl., ECF No. 1.  PPNYC filed a motion for summary judgment and sought a preliminary or permanent injunction preventing defendants from implementing the FOAs.  Pl.'s Notice of Mot., July 24, 2018, ECF No. 32.  Defendants moved to dismiss for lack of standing and filed a cross-motion for summary judgment.  Defs.' Notice of Mot., Aug. 2, 2018, ECF No. 45.  A brief was filed by twenty members of Congress as amici curiae represented by pro bono counsel (Boris Bershteyn, Mollie Kornreich, Tansy Woan, Micah Fergenson, and Natalie Gabrenya) in support of plaintiffs.  Br., July 27, 2018, ECF No. 38-1.  The parties requested that the Court issue a

decision in this case no later than September 5, 2018. Accordingly, the Court ordered an expedited briefing schedule, which was completed on August 16, 2018. See Order, July 17, 2018, ECF No. 24.

## III. <u>DISCUSSION</u>

### A. Standing

Before turning to the merits, "we are required to assure ourselves of jurisdiction." <u>Am. Atheists, Inc. v. Port Auth. of N.Y. & N.J.</u>, 760 F.3d 227, 237 n.11 (2d Cir. 2014). Article III of the Constitution requires that a plaintiff establish standing in order for a case to be justiciable. <u>Lujan v. Defs. of Wildlife</u>, 504 U.S. 555, 559-60 (1992). "If plaintiffs lack Article III standing, a court has no subject matter jurisdiction to hear their claim." <u>Cent. States Se. & Sw. Areas Health & Welfare Fund v. Merck-Medco Managed Care, L.L.C.</u>, 433 F.3d 181, 198 (2d Cir. 2005).

The irreducible constitutional minimum of standing consists of three elements: injury in fact, causation, and redressability. <u>Lujan</u>, 504 at 560-61. The plaintiff, as the party invoking federal jurisdiction, bears the burden of establishing these elements for each claim asserted. <u>Spokeo, Inc. v. Robins</u>, 136 S. Ct. 1540, 1547 (2016). "Since they are not mere pleading requirements but rather an indispensable part of the plaintiff's case, each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, <u>i.e.</u>, with the manner and

14

degree of evidence required at the successive stages of the litigation." Lujan, 504 U.S. at 561. "In response to a summary judgment motion, however, the plaintiff can no longer rest on such 'mere allegations,' but must 'set forth' by affidavit or other evidence 'specific facts'" supporting its standing. Id. (quoting Fed. R. Civ. P. 56(e)).

Defendants argue that this case should be dismissed because plaintiffs have failed to properly assert injury in fact and redressability.

### 1.  Injury in Fact

Defendants begin by arguing that plaintiff has not established an injury in fact because it did not apply for funding under the 2018 FOAs. "To establish injury in fact, a plaintiff must show that he or she suffered an invasion of a legally protected interest that is concrete and particularized and actual or imminent, not conjectural or hypothetical." Spokeo, 136 S. Ct. at 1548 (internal quotation marks omitted). "[T]hreatened injury must be certainly impending to constitute injury in fact . . . allegations of possible future injury are not sufficient." Clapper v. Amnesty Int'l, 568 U.S. 398, 409 (2013) (emphasis in original) (internal quotation marks omitted). "A plaintiff seeking injunctive or declaratory relief cannot rely on past injury to satisfy the injury requirement." Deshawn E. ex rel. Charlotte E. v. Safir, 156 F.3d 340, 344 (2d Cir. 1998). Rather, that plaintiff

"must show a likelihood that he or she will be injured in the future." Id.

Plaintiff asserts that its injury in fact is its inability to compete on an equal footing under the 2018 FOAs, while defendants reply that plaintiff was required to actually submit a bid for funding under the 2018 FOAs in order to have suffered a cognizable injury in fact. Defendant's position is not supported by the case law. Rather, to establish an injury in fact, a plaintiff "need only demonstrate that it is able and ready to bid on contracts," and is prevented from doing so on an equal basis by a government policy. Ne. Fla. Chap. of Assoc. Gen. Contractors of Am. v. City of Jacksonville, 508 U.S. 656, 666 (1993). "The inability to compete on an equal footing in the bidding process" is sufficient to establish an injury in fact; a plaintiff need not actually plead that it bid and lost a contract. Id.; cf. Regents of Univ. of California v. Bakke, 438 U.S. 265, 280 n.14 (1978) ("injury" is plaintiff's inability to compete for admission). This theory of standing is not without limits: a potential bidder must at least establish "that it very likely would have bid on the contract but for" the alleged unlawful action. MGM Resorts Int'l Glob. Gaming Dev., LLC v. Malloy, 861 F.3d 40, 47 (2d Cir. 2017).

Plaintiff here asserts that its core mission consists of providing sexual and reproductive health care and health education, including by providing community education and training

16

to teens through community-based partnerships and in schools. Barnette Decl. ¶¶ 1, 3-5, ECF No. 39.  To accomplish its mission, plaintiff researches the requirements of public and private grants, applies for appropriate grants, develops and tests new and innovative programs, and implements existing evidence-based programs.  Id.

Consistent with its mission and practice, plaintiff has bid for TPP funding at every opportunity since the TPP Program was established in 2010 until now.  In 2010, plaintiff successfully bid on a five-year Tier 1 grant to replicate the "Making Proud Choices!" program in schools, after-school programs, and community-based organizations in Manhattan, Brooklyn, Queens, and the Bronx.  Compl. ¶ 87; 56.1 Stmt. ¶¶ 48-49.  Plaintiff bid again for funding under the 2015 FOAs.  While plaintiff's bid for Tier 1B funding was initially unsuccessful, plaintiff sought to continue participating in the TPP Program, and eventually received funding as a sub-grantee of another project that had been awarded a Tier 2A grant.  56.1 Stmt. ¶¶ 50, 51.

Plaintiff represents that it was interested in bidding for another grant when the 2018 FOAs were first announced.  Barnette Decl. ¶ 23, ECF No. 39.  Specifically, plaintiff considered applying for a Tier 1 Grant to replicate the "Power Through Choices" curriculum, which is designed for teens in foster care and juvenile justice centers, as well as an evaluation of its

17

"Adult Role Models" program for funding under a Tier 2 Grant.
Barnette Decl. ¶ 24, ECF No. 39. Plaintiff's staff participated
in informational calls with HHS, and plaintiff's Director of
Private and Public Funding exchanged correspondence in May 2018
with HHS's "Tier 2 FOA Team" regarding the logistics of the
summative outcome evaluation and developmental implementation
evaluation as described in the 2018 FOAs. Barnette Decl. ¶ 23,
ECF No. 39; Barnette Decl. Ex. M, ECF No. 39-13. After analyzing
the 2018 FOAs, plaintiff ultimately decided that its applications
for funding could not compete under the 2018 FOAs. Barnette Decl.
¶¶ 25, 41-50, ECF No. 39.

Given plaintiff's mission, prior bidding history, and
exploratory efforts to bid for funding under the 2018 FOAs,
plaintiff has asserted specific facts sufficient to support its
contention that it "very likely would have bid" absent HHS's
allegedly unlawful actions. See MGM, 861 F.3d at 47.

In an effort to avoid that conclusion, defendants reply
primarily on MGM and Warth v. Seldin, cases where courts found
injury in fact lacking where a supposedly potential bidder had "no
concrete plans," MGM, 861 F.3d at 50, or "no specific project,"
Warth v. Seldin, 422 U.S. 490, 516 (1975). Rather than persuade
us to adopt defendants' stance, these cases solidify our conclusion
that plaintiff here suffered a cognizable injury in fact. In MGM,
a casino developer challenged Connecticut legislation that created

18

a special registration pathway for the state's two federally-
recognized Indian tribes to apply to build commercial casinos on
non-Indian land.  861 F.3d at 43-44.  The developer alleged that
this legislation placed it at a competitive disadvantage in the
gaming industry.  Id. at 43.  The Second Circuit held that
because the developer pleaded only that it was "interested in
exploring development opportunities in Connecticut," but had "not
alleged any concrete plans to enter into a development agreement"
or "alleged that there [wa]s any specific project that it [wa]s
prevented from bidding on" by the legislation, its alleged harms
were not sufficiently imminent to constitute an injury in fact.
Id. at 47-48 (internal quotation marks omitted).

Warth v. Seldin involved a challenge by a group of developers
to a zoning ordinance in Penfield, New York that they alleged
arbitrarily and capriciously prevented them from building low- and
moderate-cost housing in the town.  422 U.S. at 493-97.  The
Supreme Court held that the developers had not properly alleged an
injury in fact because they had no concrete plans to build that
would have been affected by the ordinance.  Id. at 514-17 ("The
complaint refers to no specific project or any of its members that
is currently precluded either by the ordinance or by respondents'
action in enforcing it.  There is no averment that any member has
applied to respondents for a building permit or a variance with
respect to any current project.  Indeed, there is no indication

19

that respondents have delayed or thwarted any project currently proposed by [plaintiff's] members.").

By contrast, plaintiff here has asserted more than mere interest in TPP Program funding.   Plaintiff describes in some detail specific projects that it would have pursued with grants under the 2018 FOAs.   However, plaintiff maintains that unlawful aspects of the 2018 FOAs have made it unable to compete for such grants.   Plaintiff's concrete plans for TPP funding are thus much more closely analogous to the plaintiffs in City of Jacksonville, 508 U.S. at 668, who "regularly bid on contracts . . . and would [have] bid on those that the city's ordinance makes unavailable to them," and Adarand Constructors v. Pena, 515 U.S. 200, 211 (1995), who made an "adequate showing that sometime in the relatively near future it w[ould] bid on another Government contract."

Defendants next contend that plaintiff lacks the "direct economic interest" required for a prospective bidder to assert injury in fact, citing Orion Tech., Inc. v. United States, 704 F.3d 1344, 1348 (Fed. Cir. 2013).   We first observe that Orion has never been cited by any court outside of the Federal Circuit, and that the Second Circuit has not articulated a "direct economic interest" test in this context.   Cf. MGM, 861 F.3d at 50 (noting that injury may even be based on "psychic or emotional harm").   The limited citation of the "direct economic test" to the standing of a bid protestor is not surprising as it arises from claims

20

asserted under the Tucker Act.  See 28 U.S.C. § 1491(b)(1) ("Both
the United States Court of Federal Claims and the district courts
of the United States shall have jurisdiction to render judgment on
an action by an interested party objecting to a solicitation by a
Federal agency for bids or proposals for a proposed contract or to
a proposed award or the award of a contract or any alleged
violation of statute or regulation in connection with a procurement
or a proposed procurement.") (emphasis added); see also Weeks
Marine, Inc. v. United States, 575 F.3d 1352, 1359 (Fed. Cir. 2009)
(28 U.S.C. § 1491(b)(1) "imposes more stringent standing
requirements than Article III").  Indeed, even the Federal Circuit
has recognized that this test cannot readily be applied in the APA
context.  See Am. Fed'n of Gov. Empls. v. United States, 258 F.3d
1294, 1302 (Fed Cir. 2001) ("We therefore are not convinced that
Congress, when using the term 'interested party' to define those
who can bring suit under § 1491(b)(1), intended to confer standing
on anyone who might have standing under the APA.").

Defendants also rely on dissimilar Tucker Act cases to argue
that plaintiff lacks standing because it failed to "exercise
reasonable diligence in pursuing" legal remedies.  See CGI Fed.
Inc. v. United States, 779 F.3d 1346, 1351 (Fed. Cir. 2015); Geo-
Med, LLC v. United States, 135 Fed Cl. 742, 748 (2017).  But the
court in Geo-Med held that plaintiff's 250-day delay in filing was
not excessive, and plaintiff here filed its complaint challenging

21

the 2018 FOAs only 45 days after these FOAs were issued.  See
Compl., ECF No. 1; TPP FY 18 Tier 1 FOA at AR000111; TPP FY 18
Tier 2 FOA at AR000199 (2018 FOAs issued May 8, 2018).  Moreover,
PPNYC filed its complaint in this case before bids were due on
June 29, 2018.  See CGI Fed., 135 Fed. Cl. at 748 ("CGI filed a
protest prior to the close of bidding and thereby established its
prospective bidder status . . . .").  Accordingly, defendants'
assertion that plaintiff failed to exercise reasonable diligence
is unfounded and cannot foreclose plaintiff's properly asserted
injury in fact.

### 2.   Redressability

In order for redressability to be satisfied, "it must be
likely that a favorable judicial decision will prevent or redress
the injury."  Summers v. Earth Island Inst., 555 U.S. 488, 493
(2009).  That is, redressability must be "likely, as opposed to
merely speculative," Friends of the Earth, Inc. v. Laidlaw Envtl.
Servs., 528 U.S. 167, 181 (2000), but it "is not a demand for
mathematical certainty," Mhany Mgmt., Inc. v. Cty. of Nassau, 819
F.3d 581, 602 (2d Cir. 2016) (quoting Toll Bros., Inc. v. Twp. of
Readington, 555 F.3d 131, 143 (3d Cir. 2009)).  Redressability
does not require that a favorable decision would provide a
plaintiff with complete relief.  Lujan, 504 U.S. at 569 n.4; Larson
v. Valente, 456 U.S. 228, 244 n.15 (1982); Consumer Data Indus.
Ass'n v. King, 678 F.3d 898, 903 (10th Cir. 2012) ("[E]ven if

22

[plaintiff] would not be out of the woods, a favorable decision would relieve their problem 'to some extent,' which is all the law requires.").

Plaintiff here seeks to declare the 2018 FOAs invalid and enjoin HHS from awarding funds thereunder.  See Compl. ¶¶ 126-28. Defendants argue that this relief would not redress plaintiff's injuries because it "would not result in the receipt of any funds by non-applicants like PPNYC." Defs.' Mem. of Law at 14, Aug. 2, 2018, ECF No. 49.  This argument clearly fails: where, as here, a plaintiff asserts a cognizable competitive injury, it may be redressed by eliminating the allegedly unlawful barrier to competition.  See City of Jacksonville, 508 U.S. at 666 n.5 ("It follows from our definition of 'injury in fact' that petitioner has sufficiently alleged both that the city's ordinance is the 'cause' of its injury and that a judicial decree directing the city to discontinue its program would 'redress' the injury."); Midwest Fence Corp. v. U.S. Dep't of Transp., 840 F.3d 932, 940 (7th Cir. 2016) ("Causation and redressability follow from [competitive injury]: . . . redressability, because invalidating the policy will again place the plaintiff on equal footing for competitive purposes.").

Even if we were to accept defendants' argument that plaintiff's injuries will not be completely redressed unless it actually receives TPP funds, restoring plaintiff to a position

where it can better compete for such funds must at least constitute partial redress, which is all that is required for purposes of Article III standing.   See <u>Monsanto Co. v. Geertson Seed Farms</u>, 561 U.S. 139, 151-53 (2010) (holding that farmers had standing to challenge restrictions on an agency's ability to deregulate a genetically-engineered product even though their ultimate goal of deregulation could not be achieved without further agency action); <u>Massachusetts v. E.P.A.</u>, 549 U.S. 497, 526 (2007) (finding redressability where relief sought would reduce further risk of injury "to some extent"); <u>Lujan</u>, 504 U.S. at 569 n.4 ("The redressability element of the Article III standing requirement and the 'complete relief' referred to by Rule 19 are not identical."); <u>Mantena v. Johnson</u>, 809 F.3d 721, 731 (2d Cir. 2015) (quoting <u>Shalom Pentecostal Church v. Acting Sec'y U.S. Dep't of Homeland Sec.</u>, 783 F.3d 156, 161-62 (3d Cir. 2015)) (holding that redressability is based on the "availability of relief at a given step, rather than the likelihood of achieving the ultimate goal").

Defendants next assert that redress is unavailable because if the 2018 FOAs were voided, "it would be impossible for HHS to draft and issue new FOAs, receive applications, process those applications, and issue new awards by the end of the fiscal year." Defs.' Mem. of Law at 14, Aug. 2, 2018, ECF No. 49.  As discussed above, redressability simply does not require plaintiff to prove that it or any similarly situated entity will actually obtain

funding.   Moreover, plaintiff suggests that an injunction would not force defendants to leave their appropriation unspent.  Rather, defendants have "numerous options," including using "the remaining funds to grant carryover requests for existing projects."[6]  Pl.'s Reply at 3 n.2, Aug. 9, 2018, ECF No. 50.   The Court will not speculate as to defendants' options going forward, other than to direct they must comply with the TPP Program's statutory mandate.

## B. Committed to Agency Discretion

The APA embodies a "'strong presumption' favoring judicial review of administrative action."  Mach Mining, LLC v. E.E.O.C., 135 S. Ct. 1645, 1651 (2015) (quoting Bowen v. Mich. Acad. of Family Physicians, 476 U.S. 667, 670 (1986)); see also Lincoln v. Vigil, 508 U.S. 182, 190 (1993).  An agency "bears a 'heavy burden' in attempting to show that Congress 'prohibit[ed] all judicial review' of the agency's compliance with a legislative mandate." Mach Mining, 135 S. Ct. at 1651 (quoting Dunlop v. Bachowski, 421 U.S. 560, 567 (1975)).

Defendants rely on a narrow exception to the "strong presumption" of reviewability.  See Salazar v. King, 822 F.3d 61, 75-76 (2d Cir. 2016) (describing the presumption as "not absolute").  Specifically, defendants argue that the 2018 FOAs are

---

[6]    Indeed, acceptance of defendants' argument would serve to encourage an agency to structure its actions in a manner designed to "run out the clock."

unreviewable under 5 U.S.C. § 701(a)(2) because they constitute agency action "committed to agency discretion by law."[7]   Section 701(a)(2) creates a narrow exception "in those rare circumstances where the relevant statute 'is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion.'"   Lincoln, 508 U.S. at 190 (quoting Heckler v. Chaney, 470 U.S. 821, 830 (1985)).   That is, the language of a statute must demonstrate "that Congress wanted an agency to police its own conduct."   Mach Mining, 135 S. Ct. at 1651.   "[J]udicial review of a final agency action by an aggrieved person will not be cut off unless there is persuasive reason to believe that such was the purpose of Congress."   Salazar, 822 F.3d at 75.

Defendants point to no statutory language in the 2018 CAA that evinces Congressional intent to insulate the 2018 FOAs from judicial review.   Instead, defendants inaccurately state that "[a]n agency's allocation of appropriated funds is typically committed to agency discretion," and "agencies' grant-award decisions are presumptively unreviewable."   Defs.' Mem. of Law at 16-17, Aug. 2, 2018, ECF No. 49 (emphasis added).   We first note that plaintiffs here are not challenging an allocation of appropriated funds or a grant-award decision, but rather the

---

[7]   5 U.S.C. § 701(a) states that the APA "applies, according to the provisions thereof, except to the extent that – (1) statutes preclude judicial review; or (2) agency action is committed to agency discretion by law." Defendants do not argue that judicial review here is precluded by statute.

establishment of FOAs under which grants will be awarded.  Even if we accept defendants' characterization of the challenged action, this argument is unpersuasive.  While the Supreme Court has held that certain allocations of funds from lump-sum appropriations may be committed to agency discretion, this narrow exception does not "typically" or "presumptively" extend to all allocations of appropriated funds.  See Lincoln, 508 U.S. at 193 ("Of course, an agency is not free simply to disregard statutory responsibilities: Congress may always circumscribe agency discretion to allocate resources by putting restrictions in the operative statutes.").  Rather, this exception from reviewability applies only "[w]here Congress merely appropriates lump-sum amounts without statutorily restricting what can be done with those funds."  Id. at 192 (quoting LTV Aerospace Corp., 55 Comp. Gen. 307, 319 (1975)).  In short, where there is "meaningful law to apply" to an agency's appropriation allocation, it is reviewable, Ramah Navajo Sch. Bd., Inc. v. Babbitt, 87 F.3d 1338, 1347-49 (D.C. Cir. 1996), but where there is "no relevant statutory reference point," it is not, Milk Train, Inc. v. Veneman, 310 F.3d 747, 751-52 (D.C. Cir. 2002) (quoting Drake v. FAA, 291 F.3d 59, 72 (D.C. Cir. 2002)).

    The statutory text here clearly provides the Court with a "relevant statutory reference point."  See id.  The 2018 CAA requires that HHS "fund medically accurate and age appropriate programs that reduce teen pregnancy."  132 Stat. at 733.  Funding

for Tier 1 grants must be "for replicating programs that have been proven effective through rigorous evaluation to reduce teenage pregnancy, behavioral risk factors underlying teenage pregnancy, or associated risk factors," and funding for Tier 2 grants shall be available "for research and demonstration grants to develop, replicate, refine, and test additional models and innovative strategies for preventing teenage pregnancy." Id. Congress thus imposed several restrictions that the agency must follow. For example, these appropriated funds may not be used for medically inaccurate or age inappropriate programs, nor may Tier 1 funding be used to replicate programs that have not been proven effective or that have not undergone rigorous evaluation. Even if the 2018 CAA can be read to provide HHS with "wide latitude" or "broad leeway" in how to allocate TPP Program funding, Congress articulated restrictions and thus parameters as to how that funding may be allotted, and the Court may apply "meaningful standards" by insisting that the agency follow these congressional directives. See Mach Mining, 135 S. Ct. at 1652; Lincoln, 508 U.S. at 190.

These restrictions on the use of funds set this case apart from those cited by defendants. The statutory text governing appropriations to the TPP Program differs markedly from that in Lincoln, which granted the Indian Health Service the broad authority "to expend such moneys as Congress may from time to time appropriate, for the benefit, care, and assistance of the Indians,"

508 U.S. at 185, Milk Train, where funds were to be used "to provide assistance directly to . . . dairy producers, in a manner determined appropriate by the Secretary," 310 F.3d at 751 (emphasis added), Alan Guttmacher Institute v. McPherson, 597 F. Supp. 1530, 1535 (S.D.N.Y. 1984), which provided for the expenditure of funds "on such terms and conditions as [the President] may determine," and Los Coyotes Band of Cahuila & Cupeno Indians v. Jewell, 729 F.3d 1025, 1038-39 (9th Cir. 2013), where plaintiffs could not identify any specific applicable statutory language.

We therefore join the other courts that have reached a consensus that the CAA creates meaningful standards such that judicial review of appropriations to the TPP Program is available under the APA.  See Policy & Research, LLC v. U.S. Dep't of Health & Human Servs., No. 18 Civ. 346 (KBJ), 2018 WL 2184449, at *7-9 (D.D.C. May 11, 2018); Healthy Teen Network v. Azar, No. 18 Civ. 468 (CCB), 2018 WL 1942171, at *8-9 (D. Md. Apr. 25, 2018); Planned Parenthood of Greater Wash. & N. Idaho v. U.S. Dep't of Health & Human Servs., No. 18 Civ. 55 (TOR), 2018 WL 1934070, at *8-10 (E.D. Wash. Apr. 24, 2018); see also Planned Parenthood of Wis., Inc. v. Azar, No. 18 Civ. 1035 (TNM), 2018 WL 3432718, at *4-5 (D.D.C. July 16, 2018) (acknowledging that judicial review of HHS funding opportunity announcement under Title X of the Public Health Service Act was appropriate since expenditure was not wholly committed to agency discretion).

## C. Final Agency Action

Defendants next challenge whether this suit properly implicates "final agency action" that may be the subject of judicial review.  See 5 U.S.C. § 704.[8]  We must first identify the relevant "action" under review, then assess whether that "action" is "agency action" as defined under 5 U.S.C. § 551(13), and finally determine whether that "agency action" is "final" for the purposes of 5 U.S.C. § 704.

Plaintiff argues that the relevant "action" is HHS's adoption of the 2018 FOAs, Pl.'s Reply at 5, Aug. 9, 2018, ECF No. 50, while defendants posit that "the process PPNYC challenges is the awarding of grants," Defs.' Reply at 3, Aug. 16, 2018, ECF No. 53.  This dispute can be resolved by examining the relief sought in the complaint:  PPNYC seeks a declaration that the FOAs are ultra vires to the 2018 CAA and arbitrary and capricious, and further seeks to enjoin HHS from using the 2018 FOAs to review applications for TPP

---

[8]   This provision states in full:

**§ 704. Actions reviewable**

Agency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review. A preliminary, procedural, or intermediate agency action or ruling not directly reviewable is subject to review on the review of the final agency action. Except as otherwise expressly required by statute, agency action otherwise final is final for the purposes of this section whether or not there has been presented or determined an application for a declaratory order, for any form of reconsideration, or, unless the agency otherwise requires by rule and provides that the action meanwhile is inoperative, for an appeal to superior agency authority.

funding and from awarding or disbursing any funds pursuant to the 2018 FOAs.   Compl. ¶¶ 126-128.   Plainly, plaintiff has not challenged "the awarding of grants," which has not yet occurred. Rather, the "action" in question is the adoption and use of the 2018 FOAs, which plaintiff seeks to have declared illegal and enjoined.

We must next determine whether the adoption of the FOAs constituted "agency action," as that phrase is defined in 5 U.S.C. § 551(11) and (13).   See Norton v. S. Utah Wilderness All., 542 U.S. 55, 62-63 (2004) (holding that "agency action" must be a "discrete listed action" or "discrete equivalent" under 5 U.S.C. § 551(13)); Whitman v. Am. Trucking Ass'ns, 531 U.S. 457, 478 (2001) ("[T]he word 'action' . . . is meant to cover comprehensively every manner in which an agency may exercise its power."); see also Fund for Animals, Inc. v. U.S. Bureau of Land Mgmt., 460 F.3d 13, 19 (D.C. Cir. 2006) (characterizing the APA's definition of "agency action" as "expansive" but "not so all-encompassing as to authorize us to exercise judicial review over everything done by an administrative agency").   Defendants argue for the first time in their reply brief that the adoption of the FOAs is not an "agency action" at all because it is not a "grant of money."[9]   But defendants ignore the breadth of the definition

_____

[9]   The fact that defendants failed to raise this argument until the fourth and final brief on these cross-motions for summary judgment is alone

31

of "agency action" under 5 U.S.C. § 551(13) ("'[A]gency action'
includes the whole or a part of an agency rule, order, license,
sanction, relief, or the equivalent or denial thereof, or failure
to act."), including the residual term "the equivalent . . .
thereof," as well as the fourteen examples of "agency action"
incorporated by reference in § 551(11)'s definition of "relief."[10]
At the very least, issuing the FOAs was an "equivalent" action
equally discrete to the listed terms in § 551(13) that would meet
the APA's "expansive" definition of "agency action."  See, e.g.,
Nat'l Mining Ass'n v. Jackson, 768 F. Supp. 2d 34, 44 (D.D.C. 2011)
(agency's change to a permitting process constitutes "agency
action").

    Having concluded that adopting the FOAs meets the definition
of "agency action," we must next determine whether doing so
constituted reviewable "final agency action."  See 5 U.S.C. § 704
("[F]inal agency action for which there is no other adequate remedy
in a court [is] subject to judicial review.").  Agency action is
final if two conditions are satisfied.  First, "the action must

---

dispositive.  See Ct. Bar Ass'n v. United States, 620 F.3d 81, 91 n.13 (2d Cir.
2010) (citing Norton v. Sam's Club, 145 F.3d 114, 117 (2d Cir. 1998) ("Issues
raised for the first time in a reply brief are generally deemed waived.")).
Nonetheless, we address this argument on its merits for the sake of
completeness.

[10]   "'[R]elief' includes the whole or a part of an agency – (A) grant of
money, assistance, license, authority, exemption, exception, privilege, or
remedy; (B) recognition of a claim, right, immunity, privilege, exemption, or
exception; or (C) taking of other action on the application or petition of, and
beneficial to, a person."  5 U.S.C. § 551(11).

mark the 'consummation' of the agency's decisionmaking process –
it must not be of a merely tentative or interlocutory nature."
<u>Bennett v. Spear</u>, 520 U.S. 154, 178 (1997) (internal citations
omitted).  Second, it "must be one by which 'rights or obligations
have been determined,' or from which 'legal consequences will
flow.'"  <u>Id.</u> (internal citations omitted).

The Supreme Court and Second Circuit have repeatedly held
that we must take a "pragmatic approach" to finality.  <u>Hawkes</u>, 136
S. Ct. at 1815; <u>F.T.C. v. Standard Oil Co. of Ca.</u>, 449 U.S. 232,
239 (1980) ("[T]he cases dealing with judicial review of
administrative actions have interpreted the 'finality' element in
a pragmatic way."); <u>Salazar v. King</u>, 822 F.3d 61, 82 (2d Cir. 2016)
(quoting <u>Sharkey v. Quarantillo</u>, 541 F.3d 75, 88 (2d Cir. 2008)
("The Supreme Court has interpreted the finality element in a
'pragmatic way.'")).[11]

---

[11]    The question of whether the requirement of "final agency action" under 5
U.S.C. § 704 is jurisdictional or an element of an APA claim has not been
resolved in the Second Circuit.  <u>See Sharkey v. Quarantillo</u>, 541 F.3d 75, 87–8
(2d Cir. 2008); <u>see also 6801 Realty Co. v. U.S.C.I.S.</u>, 719 F. App'x 58, 59 n.1
(2d Cir. 2018) ("[W]hether the APA's 'final agency action' requirement . . . is
jurisdictional is an open question in our Circuit.  We need not decide that
complex question here . . . .").

    We note that the majority of courts and commentators have suggested that
the Supreme Court's decisions in <u>Arbaugh v. Y & H Corp.</u>, 546 U.S. 500 (2006),
and <u>Califano v. Sanders</u>, 430 U.S. 99 (1977), point to a conclusion that the
"final agency action" requirement is not jurisdictional.  <u>See Trudeau v. FTC</u>,
456 F.3d 178, 184 (D.C. Cir. 2006); <u>see</u> <u>Sharkey</u>, 541 F.3d 75, 87 & n.10; <u>Pearl
River Union Free Sch. Dist. v. Duncan</u>, 56 F. Supp. 3d 339, 351 (S.D.N.Y. 2015)
("[T]he better view appears to be that the requirement is not jurisdictional in
nature."); <u>see also</u> Comment, <u>Jurisdictional Rules and Final Agency Action</u>, 125
Yale L. Rev. 785 (2015).  <u>But see</u> <u>Belle Co. v. United States Army Corps of
Engineers</u>, 761 F.3d 383 (5th Cir. 2014) (affirming final agency action dismissal

We therefore turn to the two criteria for "final agency action," beginning with the "consummation" prong.  Our analysis of this prong is straightforward:  Defendants do not and cannot contest that the version of the FOAs before the Court is subject to no further revision, and is by no means "tentative."  See Bennett, 520 U.S. at 178.  In defendants' own words, the FOAs have established a "formalized agency review process" for applicants seeking TPP funding.  Defs.' Mem. of Law, Aug. 2, 2018, ECF No. 49.

We reject defendants' contention that there can never be "consummation" in this context until an agency has actually issued grant awards.  See, e.g., State ex rel. Becerra v. Sessions, 284 F. Supp. 3d 1015, 1031-32 (N.D. Cal. 2018).  Rattlesnake Coal. v. E.P.A., 509 F.3d 1095, 1104 (9th Cir. 2007), the case cited for this proposition, does not stand for such a broad rule.  The challenged action in Rattlesnake was a congressional earmark to the EPA for a wastewater project.  Id. at 1098-99, 1103.  The court held that a congressional appropriation did not constitute "final agency action" because Congress is excluded from the APA's definition of an agency, and that under those circumstances there

for lack of subject-matter jurisdiction), vacated on other grounds sub nom. Kent Recycling Servs., LLC v. U.S. Army Corps of Eng'rs, 136 S. Ct. 2427 (2016).

The parties have not briefed this issue, and it is not determinative of the result here.  Plaintiff has met its burden under either the Rule 12(b)(1) or Rule 56(a) standard.

34

would be no final agency action until the EPA actually decided to disburse the appropriated funds. Id. at 1103-04 (citing 5 U.S.C. § 701(b)(1)(a)). By contrast, plaintiff here challenges the agency's adoption of the FOAs, rather than an action of Congress itself.

We therefore move to the second prong of our final agency action analysis - whether the challenged action is one by which rights or obligations have been determined or from which legal consequences will flow. See Bennett, 520 U.S. at 177-78. For this prong, "the core question is whether the result of [the agency's decisionmaking] process is one that will directly affect the parties." Salazar, 822 F.3d at 82 (quoting Sharkey, 541 F.3d at 88).

Under the 2018 Tier 1 FOA, a "[c]urriculum must be selected . . . to address and replicate each of the elements in one of the two programs," and the FOAs definitively establish the two "programs" that an applicant for Tier 1 funding must replicate: the SMARTool and TAC. TPP FY 18 Tier 1 FOA at AR000034-35, AR000043-45. This structure creates "direct and appreciable consequences" for any applicant for TPP funding: The applicant must replicate one of these "programs." See Bennett, 520 U.S. at 178.

Defendants assert that the FOAs do not immediately create legal consequences for the plaintiff because they do not implicate

plaintiff's eligibility for funding.  We disagree.  Of course, the FOAs' "Application Disqualification Criteria" contain certain pro forma requirements, namely, whether an application is timely submitted and meets certain stylistic and page-limit requirements, whether an applicant is an institution rather than an individual, and whether the request for funding is within a defined range. See TPP FY 18 Tier 1 FOA at AR000058-62; TPP FY 18 Tier 2 FOA at AR000151-54.   Significantly,   under   "Other   Eligibility Information," the 2018 Tier 1 FOA states that it will "eliminate [an application] from the competition and it will not be reviewed" unless "one of the two eligible programs," SMARTool or TAC, "is clearly identified" for replication.  TPP FY 18 Tier 1 FOA at AR000060; see also TPP FY 18 Tier 2 FOA at AR000152-53.

Thus, an applicant interested in replicating any other "program" is not eligible to receive funding.  HHS's decision to predicate eligibility for funding on replicating either the SMARTool or TAC "directly affects" plaintiff.  See Salazar, 822 F.3d at 82.  Indeed, defendants concede, as they must, that courts routinely hold that agency action is final where it affects grant eligibility criteria.  See Defs.' Mem. of Law at 4 n.2, Aug. 2, 2018, ECF No. 49 (citing Becerra, 284 F. Supp. 3d at 1031-32; City of Phila. v. Sessions, 309 F. Supp. 3d 271, 280 (E.D. Pa. 2018);

36

<u>Nat'l Mining Ass'n v. Jackson</u>, 768 F. Supp. 2d 34, 42 (D.D.C. 2011); <u>Arizona v. Shalala</u>, 121 F. Supp. 2d 40 (D.D.C. 2000)).[12]

<u>Becerra</u> and <u>City of Philadelphia</u>, involving challenges filed by the State of California and the City of Philadelphia against the Department of Justice ("DOJ") for imposing immigration-related conditions on the receipt of certain grants, are particularly analogous here.  California and Philadelphia each filed suit after DOJ announced that it was imposing these conditions, but before DOJ had awarded the grants.  DOJ therefore argued that there had been no final agency action because it had not yet determined whether these plaintiffs met these conditions, nor whether plaintiffs would actually receive any funding.  <u>Becerra</u>, 284 F. Supp. 3d at 1032; <u>see also</u> <u>City of Phila</u>, 309 F. Supp. 3d at 280. Both courts rejected that argument, finding that DOJ's action was final because "[r]eceipt of the grants [wa]s conditioned on certifying compliance."  <u>Becerra</u>, 284 F. Supp. 3d at 1032; <u>see</u>

---

[12]   This fact also distinguishes this case from <u>Planned Parenthood of Wisconsin, Inc. v. Azar</u>, No. 18 Civ. 1035 (TNM), 2018 WL 3432718, at *6-9 (D.D.C. July 16, 2018), <u>appeal docketed</u>, No. 18-5218 (D.C. Cir. July 20, 2018), a challenge to an HHS funding opportunity announcement under Title X of the Public Health Service Act.  The court determined that this funding opportunity announcement was not "final agency action" for three reasons:  (1) no Title X grants have yet issued under the challenged review criteria; (2) the challenged announcement lays out the criteria for an intermediate stage in the grant review process; and (3) the challenged criteria do not legally bind Title X grant applicants.  <u>Id.</u>  The court acknowledged that these first two grounds were premised on the fact that the "case involves scoring criteria, not eligibility," which is not true here.  <u>Id.</u> at 6.  The third ground is unique to the Title X context and, in any event, derives from Supreme Court dicta in the context of a First and Fifth Amendment facial challenge to other HHS regulations.  <u>Id.</u> at 8-9 (citing <u>Rust v. Sullivan</u>, 500 U.S. 173, 199 n.5 (1991)).

also <u>City of Phila</u>, 309 F. Supp. 3d at 280 ("[A]ll grant recipients must comply with" the conditions, and to comply with the conditions, "the City will have to significantly alter its policies, to the detriment of public health and safety."). Similarly here, any applicant for funding under the 2018 FOAs must comply with the condition that they replicate either the SMARTool or TAC.

Defendants next argue that plaintiff actually "preemptively challenge[s]" the independent review panels' application of the scoring criteria in the 2018 FOAs, and that these panels' scores "amount to nothing more than recommendations" to the OAH Director, who is responsible for final award selections. Defs.' Mem. of Law at 16, Aug. 2, 2018, ECF No. 49 (citing TPP FY 18 Tier 1 FOA at AR000094; TPP FY 18 Tier 2 FOA at AR000183-84). This argument fails for at least two reasons. First, as discussed above, the challenged action here is the adoption of the FOAs, not the panel's scoring. <u>See</u> Compl. ¶¶ 126-28. Second, defendants do not and cannot argue that any further action is necessary from the OAH Director to decide which "programs" prospective applicants must replicate.

In any event, the facts of this case differ significantly from <u>Dalton v. Specter</u>, 511 U.S. 462 (1994), and its companion case <u>Franklin v. Massachusetts</u>, 505 U.S. 788 (1992), the two cases relied on by defendants in support of this argument. The

38

challenged action in <u>Dalton</u> - the submission of base closure recommendations to the President - was in no way binding on the President, who had absolute discretion to accept or reject them, 511 U.S. at 474-77, and the challenged action in <u>Franklin</u> - a report tabulating the results of the census - was a "tentative recommendation" that carried "no direct consequences," 505 U.S. at 797-801.   By contrast, the OAH Director's discretion is circumscribed here because she may not award any Tier 1 funding under the 2018 FOAs unless the grant application attempts to replicate either the SMARTool or the TAC.   TPP FY 18 Tier 1 FOA at AR000060.

* * *

We have addressed defendants' arguments on standing, agency discretion, and finality individually, but it is important to recognize the import of their acceptance writ large.   Defendants assert that the agency has not yet reached a final decision, and plaintiff has suffered no injury, because no grants have yet been awarded.   But, if grants do issue, defendants argue that plaintiff will have suffered no injury because plaintiff did not apply for any funding, because the awarding of grants is subject to agency discretion, and because defendants have proclaimed that the OAH Director's decisions are unappealable and unreviewable.[13]   Put

---

[13]   The 2018 FOAs themselves purport to preclude any challenge to grants made thereunder:   "All award decisions, including level of funding if an award is

differently, defendants' position appears to be "heads I win, tails you lose."   This position is in derogation of the statutory presumption favoring judicial review of administrative action.

The Court recognizes that Congress may create a statutory scheme that has the effect of insulating administrative action from judicial review in certain circumstances where it does so explicitly, see 5 U.S.C. § 701(a)(1) (providing an exception from judicial review under the APA where "statutes preclude judicial review"), or where it commits the decision to the discretion of the President, see, e.g., Dalton, 511 U.S. at 474-77 (recognizing that the consequence of the decision was to foreclose judicial review).  That is simply not the case here.  We can discern nothing in the statutory scheme that reflects congressional intent to prevent or limit judicial review.

**D. Merits**

Plaintiff asserts four overlapping claims for relief, alleging that the 2018 FOAs are:  (1) contrary to the 2018 CAA in violation of the APA, 5 U.S.C. § 706(2)(A), Compl. ¶¶ 95-103; (2) arbitrary and capricious in violation of the APA, 5 U.S.C. § 706(2)(A), id. ¶¶ 104-11; (3) outside HHS's statutory authority and therefore ultra vires, id. ¶¶ 112-19; and (4) not "applied only to the objects for which the appropriations were made," in

---

made, are final and you may not appeal."  TPP FY 18 Tier 1 FOA at AR000094; TPP FY 18 Tier 2 FOA at AR000183.

violation of the Anti-Deficiency Act, 31 U.S.C. § 1301(a), id. ¶¶ 120-25. The parties appear to agree that plaintiff's first, third, and fourth claims all hinge on the same question: whether the 2018 FOAs are contrary to the congressional mandate for the TPP Program.[14] See Pl.'s Reply at 11, Aug. 9, 2018, ECF No. 50; Defs.' Mem. of Law at 18, Aug. 2, 2018, ECF No. 49. We adopt this approach, and will address these three claims together and separately assess whether the 2018 FOAs are arbitrary and capricious.

### 1. 2018 Tier 1 FOA

#### a) Contrary to Law

Plaintiff first argues that the 2018 Tier 1 FOA conflicts with the statutory restrictions on the TPP Program and should therefore be held unlawful and set aside because it is "not in accordance with law" under 5 U.S.C. § 706(2)(A).

"It is well settled that an agency may only act within the authority granted to it by statute." Nat. Res. Def. Council v.

---

[14] Plaintiff does not demonstrate how its ultra vires claim differs in any meaningful way from its claim that the 2018 FOAs are contrary to law under the APA. The parties' briefing on the Anti-Deficiency Act claim is spare, and plaintiff does not argue in support of this claim in its reply brief. Under these circumstances, we may deem this claim to be abandoned. See, e.g., Phoenix Light Ltd. v. Bank of N.Y. Mellon, No. 14 Civ. 10104 (VEC), 2017 WL 3973951, at *21 (S.D.N.Y. Sept. 7, 2017). In any event, courts have held that "[n]o private right of action for declaratory, mandatory[,] or injunctive relief exists under the Anti-Deficiency Act." Feldman v. Bowser, 315 F. Supp. 3d 299 (D.D.C. 2018) (quoting Thurston v. United States, 696 F. Supp. 680, 683 (D.D.C. 1988)).

Nat'l Highway Traffic Safety Admin., 894 F.3d 95, 108 (2d Cir. 2018).   The basis for this rule is that an administrative agency is a "creature of statute, having no constitutional or common law existence or authority, but only those authorities conferred upon it by Congress."   Id. (quoting Atlantic City Elec. Co. v. FERC, 295 F.3d 1, 8 (D.C. Cir. 2002)).   Our analysis therefore turns on "whether the agency has gone beyond what Congress has permitted it to do."   Id. (quoting City of Arlington v. FCC, 569 U.S. 290, 297-98 (2013)).   We "must reject administrative constructions" that are "contrary to the 'unambiguously expressed intent of Congress.'"   Pub. Citizen, Inc. v. Mineta, 340 F.3d 39, 55 (2d Cir. 2003) (quoting Chevron U.S.A. Inc. v. Natural Res. Def. Council, 467 U.S. 837, 842-43 (1984)).

Under Skidmore v. Swift & Co., 323 U.S. 134, 140 (1944), we will consider the agency's interpretation of its governing statute, but "[t]he weight we accord [its] explanation . . . depends on its thoroughness, consistency, and persuasiveness." Wyeth v. Levine, 555 U.S. 555, 577 (2009) (citing United States v. Mead Corp., 533 U.S. 218, 234-35 (2001); Skidmore, 323 U.S. at 140).   Its "interpretation is 'entitled to respect' only to the extent it has the 'power to persuade.'"   Gonzales v. Oregon, 546 U.S. 243, 256 (2006) (quoting Skidmore, 323 U.S. at 140).

We begin, as we must, with the text of the statute.   See, e.g., Landreth Timber Co. v. Landreth, 471 U.S. 681, 685 (1985)

("[T]he starting point in every case involving construction of a statute is the language itself."). The 2018 CAA states, in relevant part:

> *Provided further*, That of the funds made available under this heading, $101,000,000 shall be for making competitive contracts and grants to public and private entities to fund medically accurate and age appropriate programs that reduce teen pregnancy and for the Federal costs associated with administering and evaluating such contracts and grants, of which not more than 10 percent of the available funds shall be for training and technical assistance, evaluation, outreach, and additional program support activities, and of the remaining amount 75 percent shall be for replicating programs that have been proven effective through rigorous evaluation to reduce teenage pregnancy, behavioral risk factors underlying teenage pregnancy, or other associated risk factors, and 25 percent shall be available for research and demonstration grants to develop, replicate, refine, and test additional models and innovative strategies for preventing teenage pregnancy: *Provided further*, That of the amounts provided under this heading from amounts available under section 241 of the PHS Act, $6,800,000 shall be available to carry out evaluations (including longitudinal evaluations) of teenage pregnancy prevention approaches: *Provided further*, That of the funds made available under this heading, $25,000,000 shall be for making competitive grants which exclusively implement education in sexual risk avoidance (defined as voluntarily refraining from non-marital sexual activity): *Provided further*, That funding for such competitive grants for sexual risk avoidance shall use medically accurate information referenced to peer-reviewed publications by educational, scientific, governmental, or health organizations; implement an evidence-based approach integrating research findings with practical implementation that aligns with the needs and desired outcomes for the intended audience; and teach the benefits associated with self-regulation, success sequencing for poverty prevention, healthy relationships, goal setting, and resisting sexual coercion, dating violence, and other youth risk behaviors such as underage drinking or illicit drug use

without normalizing teen sexual activity: *Provided further*, That no more than 10 percent of the funding for such competitive grants for sexual risk avoidance shall be available for technical assistance and administrative costs of such programs . . . .

2018 CAA, 132 Stat. at 733.

After setting aside up to 10% of the $101,000,000 for program support activities, 75% of the remaining funds are allocated to so-called "Tier 1 Grants." These grants are "for <u>replicating programs</u> that have been <u>proven effective through rigorous evaluation</u> to reduce teenage pregnancy, behavioral risk factors underlying teenage pregnancy, or other associated risk factors." <u>Id.</u> (emphasis added). That is, the model "programs" to be "replicat[ed]" must "have been proven effective through rigorous evaluation," and applicants' proposed "programs" must "replicat[e]" these models.

The other 25% of the remaining funds are allocated to "Tier 2 Grants," which "shall be available for research and demonstration grants to <u>develop, replicate, refine, and test additional models and innovative strategies</u> for preventing teenage pregnancy." <u>Id.</u> (emphasis added). An additional $6,800,000 is allocated to "carry out evaluations (including longitudinal evaluations) of teenage pregnancy prevention approaches." <u>Id.</u> (emphasis added). The 2018 CAA thus sets out a multi-tiered approach where three-quarters of the funding is allocated to Tier 1 Grants for "replicating programs proven effective through rigorous evaluation," and one-quarter of

44

the funding is set aside for developing and refining new programs and strategies under Tier 2, with additional funding provided for evaluations, and administrative support.   Id.

Plaintiff argues that the 2018 Tier 1 FOA is in conflict with three aspects of the statutory text of the Tier 1 provisions of the 2018 CAA.   We therefore first examine the meaning of "programs," followed by "replicating," and then "proven effective through rigorous evaluation."   We then compare the statutory requirements to the two model "programs" selected for replication in the Tier 1 FOA.

"Program" is not defined in the 2018 CAA, so "we give the term its ordinary meaning."   Encino Motorcars, LLC v. Navarro, 138 S. Ct. 1134, 1140 (2018) (quoting Taniguchi v. Kan Pac. Saipan, Ltd., 566 U.S. 560, 566 (2012) (consulting dictionaries)).   The word "program" is susceptible to numerous meanings depending on its context.   See "Program," Merriam-Webster's Collegiate Dictionary (11th ed.), https://www.merriam-webster.com/dictionary/program (listing six definitions).   Defendants prefer Merriam-Webster's third definition, "a plan or system under which action may be taken toward a goal," eschewing the definitions "curriculum" and "prospectus, syllabus."   Id.

The term "replicate" means to "duplicate" or "repeat."   See "Replicate," Merriam-Webster's Collegiate Dictionary (11th ed.), https://www.merriam-webster.com/dictionary/replicate; see also

45

Lott v. Levitt, 469 F. Supp. 2d 575, 581 (N.D. Ill. 2007), aff'd, 556 F.3d 564 (7th Cir. 2009) (surveying dictionary definitions and concluding that "'replicate' means to repeat, duplicate, copy, or reproduce."); In re AMR Corp., 536 B.R. 360, 371 (Bankr. S.D.N.Y. 2015) (same).[15]   Under any of these definitions, "replicating" requires the prior existence of something that is to be duplicated, repeated, copied, or reproduced.  One cannot create something novel through replication.  Thus, for a "program" to be "replicable," it must be a "plan," "curriculum," or "syllabus" that already exists and that can be copied or reproduced.

The 2018 Tier 1 FOA requires applicants for grants to "replicate" one of two "programs": the SMARTool or the TAC.  TPP FY 18 Tier 1 FOA at AR000043-44.  But by their own descriptions, neither is a "program."  The "Introduction" paragraph to the SMARTool describes it as "a research-based tool designed to help organizations assess, select, and implement effective programs and curricula that support sexual risk avoidance."  SMARTool at AR001829 (emphasis added); see also id. at AR001830 ("The Center for Relationship Education (REAL Essentials) team and its expert consultants have systematically reviewed existing risk-avoidance research, defined components of effective programming, described

---

[15]    Depending on the context, "replicating" may not be limited to making exact copies, see, e.g., Arborjet, Inc. v. Rainbow Treecare Sci. Advancements, Inc., 794 F.3d 168, 171-72 (1st Cir. 2015), but, at the very least, it must involve creating a very close approximation of the original.

critical areas of curricular development, and identified training processes that support sexual risk-avoidance programs. These results are compiled in this <u>tool</u>, which can be used to <u>assess a variety of sexual risk-avoidance curricula and programs</u>.") (emphasis added); <u>id.</u> at AR001832 ("How to Use the SMARTool: The SMARTool <u>provides guidance</u> on both <u>programs and curricula</u>.") (emphasis added); <u>id.</u> at AR001857 ("In conclusion, the SMARTool (both the descriptive document and the associated Scoring Grid) should be used to: identify community and program needs, goals and implementation processes; select a curriculum that corresponds to the program's target population and goals; [and] assure that the targeted factors affects youth sexual behavior are included in the program content . . . ."). Thus, by its own account, the SMARTool is not itself a "program," but rather provides guidance on the selection and implementation of programs.

Similarly, the TAC is – by name – a "Tool to Assess the Characteristics of Effective Sex and STD/HIV Education Programs." Douglas Kirby, <u>et al.</u>, "Tool to Assess the Characteristics of Effective Sex and STD/HIV Education Programs" ("TAC") at AR001894; <u>see also</u> <u>id.</u> at AR001900 ("What Is the Rationale behind the [TAC]? . . . [T]here is a great need to identify and implement those programs that are most effective at reducing sexual risk-taking among teens."); <u>id.</u> ("What Is the TAC? The [TAC] is an organized set of questions designed to help practitioners assess

47

whether curriculum-based programs have incorporated the common characteristics of effective programs."); <u>id.</u> at AR001902 ("Healthy Teen Network and ETR Associates are pleased to present the [TAC]. Our hope is that it will help you select, improve, develop and implement effective pregnancy and STD prevention programs for the youth you serve in your communities."); <u>id.</u> at AR001903 ("[T]he TAC is designed primarily to help you select effective programs . . . ."). The TAC also defines "Program" in its glossary as "a set of activities packaged in a purposeful way with the goal of preventing a problem, treating a problem, and/or supporting an individual or a group," and provides examples of adolescent reproductive health "programs." <u>Id.</u> at AR001964. The TAC itself does not purport to meet its own definition of "program."

Defendants urge us not to take the SMARTool and TAC at their word when they explain that they are not "programs," and insist that the SMARTool and TAC meant something else by "programs" than Congress did when it drafted the 2018 CAA. Defendants make no attempt to explain <u>how</u> the SMARTool and TAC's usage of "programs" differed from Congress's. They merely assert that "there is no reason to equate Congress's use of the word 'program' in the TPP Program appropriation and private parties' use of the word in the documentation for the SMARTool or TAC programs." Defs.' Reply at

11, Aug. 16, 2018, ECF No. 53.  This argument does not withstand scrutiny.

Of course, words may take on different meanings in different technical settings, and it is possible for Congress and a private party to use the same word in two different ways.  See, e.g., Mac's Shell Serv., Inc. v. Shell Oil Prods. Co. LLC, 559 U.S. 175, 182–84 (2010) (contrasting the technical and ordinary usages of the words "terminate" and "cancel").  But here, Congress and the authors of the SMARTool and TAC use the word "program" in the exact same context and technical setting.  Indeed, all three focus on the same concepts and employ the same jargon while doing so.[16] Compare, e.g., 2018 CAA, 132 Stat. at 733 (funding "medically accurate and age appropriate programs") with SMARTool at AR001840 ("Review of Published Age-Appropriate Topics"), id. at AR001841 ("Scientific and Medical Accuracy"), and TAC at AR001933-34 ("Is the information medically accurate? . . . Is this an appropriate message for the youth you are reaching in your community?").

Rather, the SMARTool and TAC are evaluative tools.  And because they are modes of assessment, they are not readily

---

[16]    We find it highly improbable that the developers of the SMARTool, who include the former director of family planning and abstinence education evaluation systems at HHS and a grants manager and research consultant at HHS, were unaware of how "program" was used in HHS's Teenage Pregnancy Program appropriations.  SMARTool at AR001825-26; see also id. at AR001852 (referring to federally funded HHS programs).

"replicabl[e]" into "programs."[17]   An applicant for funding who faithfully address all nine characteristics of the SMARTool or all 17 characteristics of the TAC would not "replicat[e]" the underlying tool.   The products of a proper "replication" process should all closely resemble the model for replication and each other.   But here, two different applicants using the same tool could devise programs that bear no likeness to one another.

Moreover, the SMARTool and TAC are not "programs" that have been "proven effective through rigorous evaluation."   The term "rigorous evaluation" is not defined in the 2018 CAA.   The plain meaning of "evaluate" is "to determine the significance, worth, or condition of usually by careful appraisal and study."   "Evaluate," Merriam-Webster's Collegiate Dictionary (11th ed.), https://www.merriam-webster.com/dictionary/evaluate.   And we must give meaning to Congress's use of "rigorous," such that a "program" must be "proven effective" by a particularly searching, "scrupulously accurate" evaluation.   See Leocal v. Ashcroft, 543

---

[17]   Defendants argue that this failure to "replicat[e]" should be excused because the 2010 and 2015 FOAs also permitted programs that did not faithfully "replicat[e]" the selected program models.   See Defs.' Mem. of Law at 20-21, Aug. 2, 2018, ECF No. 49.   Specifically, defendants note that the earlier FOAs permitted applicants to make "adaptations . . . to make the program more relevant to ethnic, racial or linguistic characteristics of the population to be served," and to "revis[e] materials to ensure LGBTQ inclusivity."   Id.   This argument fails for two reasons.   First, the 2010 and 2015 FOAs are not being challenged here, and we will not offer a retroactive opinion as to whether those FOAs complied with the applicable statutory mandate.   Second, defendants' cited examples appear calculated to permit applicants to expand programs' reach to a broader audience and thereby amplify their message, rather than offering a different message entirely.

U.S. 1, 12 (2004) (holding that a court "must give effect to every word of a statute wherever possible"); "Rigorous," Merriam-Webster's Collegiate Dictionary (11th ed.), https://www.merriam-webster.com/dictionary/rigorous (defining "rigorous" as, inter alia, "very strict," "scrupulously accurate," and "precise").

We next consider how "rigorous evaluation" is used elsewhere in the same statute.  See FDA v. Brown & Williamson Tobacco Corp., 529 U.S. 120, 133 (2000) (holding that a court must "interpret the statute as a symmetrical and coherent regulatory scheme, and fit, if possible, all parts into an harmonious whole.") (internal citation and quotation marks omitted); see Scialabba v. Cuellar de Osorio, 134 S. Ct. 2191, 2204-05 (2014) (examining each time Congress used the word "conversion" in the Child Status Protection Act).  This phrase also appears in the section of the 2018 CAA immediately preceding the TPP Program:  "[A]mounts appropriated under this heading may be used for grants to States under section 361 of the [Older Americans Act of 1965] only for disease prevention and health promotion programs and activities which have been demonstrated through rigorous evaluation to be evidence-based and effective."  2018 CAA, 132 Stat. at 732 (emphasis added).

We also examine the way this phrase has been employed in similar statutes.  See United States v. Sioux, 362 F.3d 1241, 1246 (9th Cir. 2004) (citing Northcross v. Bd. of Educ. of Memphis City Schs., 412 U.S. 427, 428 (1973) ("It is an elementary principle of

statutory construction that similar language in similar statutes should be interpreted similarly.")).  "Rigorous evaluation" appears in the statutory provisions of the State Abstinence Education Program, 42 U.S.C. § 710, which defines "'rigorous,' with respect to research or evaluation," as "using (A) established scientific methods . . . or (B) other evidence-based methodologies . . . ."  42 U.S.C. § 710(e)(3).  Congress also used "rigorous evaluation" in the Bipartisan Budget Act of 2018, where it is defined to include "well-implemented randomized controlled trials."  Pub. L. 115-123, 132 Stat. 64, 270 (Feb. 9, 2018) (proposals from States or local governments for social impact partnership projects may include "the evaluator's experience in conducting <u>rigorous evaluations</u> of program effectiveness including, where available, <u>well-implemented randomized controlled trials</u>") (emphasis added).  Thus, Congress has used "rigorous evaluation" elsewhere to mean a robust empirical analysis, including by means of randomized controlled trials.[18]

This interpretation is consistent with the structure of the 2018 CAA, which sets aside funding and creates multiple mechanisms

---

[18]    We are cognizant of the canon of construction that "[w]here Congress includes particular language in one section of a statute but omits it from another, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion."  <u>See</u> <u>Russello v. United States</u>, 464 U.S. 16, 23 (1983).  We do not interpret "rigorous evaluation" as used in the 2018 CAA to require any specific method of analysis, such as randomized controlled trials, but we observe that Congress understands "rigorous evaluation" to include such methods.

to evaluate "programs" to determine if they have been proven effective. Most directly, $6,800,000 in funding is made available to "carry out evaluations." 2018 CAA, 132 Stat. at 733. Indeed, this funding has been used for the TPP Evidence Review, which, until the 2018 FOAs, provided the list of program "proven effective by rigorous evaluation." See 2010 Tier 1 FOA, Torrance Decl. Ex. A at 7, 38, ECF No. 46-1. Tier 2 is also structured to serve as a laboratory for Tier 1. The TPP Program sets aside Tier 2 funding to "develop, replicate, refine, and test additional models" – that is, ones that may not yet have been "proven effective" – and "innovative strategies" that, based on their novelty, have not yet been subject to "rigorous evaluation." 2018 CAA, 132 Stat. at 733. The statute thus contemplates that "programs" will prove their mettle, either through smaller Tier 2 grants or by other means of rigorous evaluation, before they can be eligible to serve as a model for programs that receive Tier 1 funding. Plainly, evaluative tools like the SMARTool and TAC have not been and cannot be evaluated by these means.

Our understanding of the 2018 CAA is further supported by its legislative history. See Disabled in Action of Metro. N.Y. v. Hammons, 202 F.3d 110, 124 (2d Cir. 2000) ("[L]egislative history may be consulted in order to confirm the meaning discerned from the text and structure of a statute."); see also United States v. Gayle, 342 F.3d 89, 94 (2d Cir. 2003) ("The most enlightening

source of legislative history is generally a committee report, particularly a conference committee report . . . ."). The July 22, 2009 Committee Report from the House Committee on Appropriations specified that the TPP Program provided funding "for evidence-based programs that have shown through rigorous evaluation, defined as randomized controlled trials, to reduce teenage pregnancy, delay sexual activity, or increase contraceptive use." H.R. Rep. No. 111-220, at 176 (2009) (emphasis added). Most notably, this Report defines "rigorous evaluation," which is not otherwise defined in the 2018 CAA, to mean "randomized controlled trials." The August 4, 2009 Committee Report of the Senate Committee on Appropriations similarly explained that Congress's intent was to fund "a wide range of evidence-based programs," S. Rep. No. 111-66, at 160 (2009), and the December 8, 2009 Conference Report used the same language, recognizing that the TPP Program would fund "a wide range of evidence-based programs," H.R. Rep. No. 111-366, at 1043 (2009). All three Reports thus highlight Congress's intent to require that TPP model "programs" be "evidence-based" and backed by precise empirical evaluation.[19]

---

[19]    While we do not rely on them in reaching this decision, amici also point us to other background documents that suggest the creation of the TPP Program was a key part of a broader emphasis by the Obama Administration on policy decisions based on "the rigorous use of performance data." Peter Orszag, Office of Management and Budget, "Building Rigorous Evidence to Drive Policy," https://obamawhitehouse.archives.gov/omb/blog/09/06/08/BuildingRigorousEviden

Unsurprisingly, defendants do not point to any empirical study or analysis of the SMARTool or TAC in the administrative record. As the SMARTool and TAC are themselves evaluative tools, they cannot readily be subject to the types of rigorous testing expected of a Tier 1 model "program." Defendants argue instead that it was "rational" to select the SMARTool and TAC as model programs for Tier 1 funding based on their "promise." Defs.' Reply at 14, Aug. 16, 2018, ECF No. 53. But promise is no substitute for proof, which is what the statute requires. By requiring applicants to "replicate" the SMARTool and TAC, defendants have violated their statutory obligation to select model "programs" "proven effective through rigorous evaluation."

Having found that the 2018 Tier 1 FOA is contrary to law, it is not necessary to reach plaintiff's argument that the content of the 2018 Tier 1 FOA was improperly driven by defendants' policy priorities.[20]

---

cetoDrivePolicy/ (June 8, 2009) (describing Tier 1 of the TPP: "[W]e're using a similar, two-tiered approach. First, we're providing more money to programs that generate results backed up by strong evidence. That's the top tier. Then, for an additional group of programs, with some supportive evidence but not as much, we've said: Let's try those too, but rigorously evaluate them and see whether they work.") (emphasis added); see also Evelyn M. Kappeler (Director, OAH) and Amy Feldman Farb (Evaluation Specialist, OAH), "Historical Context for the Creation of the Office of Adolescent Health and the Teen Pregnancy Prevention Program," 54 JOURNAL OF ADOLESCENT HEALTH 53 (2014) (describing the TPP Program as one of the Obama Administration's "evidence-based social policy initiatives" that "utiliz[ed] evidence-based models").

[20]    Similarly, we need not address plaintiff's specific assertions that defendant Valerie Huber is biased in favor of abstinence-only education because she served as the abstinence education coordinator for the Ohio Department of Health from 2004 to 2007, formed the National Abstinence Education Association

b)   <u>Arbitrary and Capricious</u>

Plaintiff next argues that we must set aside the 2018 Tier 1 FOA because it represents arbitrary and capricious agency action in violation of 5 U.S.C. § 706(2)(A).  An agency "must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made."  <u>Encino Motorcars, LLC v. Navarro</u>, 136 S. Ct. 2117, 2125 (2016) (quoting <u>Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.</u>, 463 U.S. 29, 43 (1983)).  "That requirement is satisfied when the agency's explanation is clear enough that its 'path may reasonably be discerned.'"  <u>Id.</u> (quoting <u>Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.</u>, 419 U.S. 281, 286 (1974)).  "But where the agency has failed to provide even that minimal level of analysis, its action is arbitrary and capricious and so cannot carry the force of law."  <u>Id.</u>; <u>see also</u> <u>State Farm</u>, 463 U.S. at 43 ("We may not supply a reasoned basis for the agency's action that the agency itself has not given.").

"Agencies are free to change their existing policies as long as they provide a reasoned explanation for the change."  <u>Id.</u> "There is no need, however for an agency to provide detailed

---

in 2007, and lobbied to eliminate the TPP Program before she was appointed Senior Policy Advisor for the Office of the Assistant Secretary for Health at HHS.  <u>See</u> Compl. ¶¶ 56-60; Pl.'s Mem. of Law at 4-7, 19, July 24, 2018, ECF No. 36; Link Decl. Ex. 1 at 6-8, Ex. 2 at 8-10, ECF No. 34.

justification for every change or to show that the reasons for the new policy are better than the reasons for the old one." <u>F.C.C. v. Fox Television Stations, Inc.</u>, 567 U.S. 239, 250 (2012). However, an agency may not "depart from a prior policy <u>sub silentio</u> or simply disregard rules that are still on the books"; it "must show that there are good reasons for the new policy." <u>F.C.C. v. Fox Television Stations, Inc.</u>, 556 U.S. 502, 515 (2009).

"Normally, an agency rule would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." <u>Pub. Citizen</u>, 340 F.3d at 53 (quoting <u>State Farm</u>, 463 U.S. at 43).

Defendants argue that their decision to install the SMARTool and TAC as the only two model "programs" in the 2018 Tier 1 FOA was justified by the fact that "internal and external sources have cast serious doubt on the efficacy of the agency's previous efforts to identify programs that can be effectively replicated in the TPP Program." Defs.' Mem of Law at 29, Aug. 2, 2018, ECF No. 49. Specifically, defendants identify the following evidence that they contend supports their decision: (1) three documents related to a study entitled "Meta-Analysis of Federally Funded Teen Pregnancy

Prevention Programs," by Randall Juras, et al., dated November 2, 2017 (the "Juras Study"); (2) a press release entitled "Teen Pregnancy Prevention Program Facts," dated August 28, 2017 (the "TPP Program Press Release" or the "Press Release"); and (3) a report entitled "The Teen Pregnancy Prevention Program (2010-2015): Synthesis of Impact Findings," by Amy Feldman Farb and Amy L. Margolis, dated June 24, 2016. Defendants contend that these materials show that "quantitative analyses of individual program models fail[ed] to generate viable options for replication," such that it was reasonable to abandon the use of model "programs" altogether and instead turn to the SMARTool and TAC. Contrary to defendants' contentions, analysis of these materials makes clear that the agency had numerous "viable options" that complied with Tier 1's statutory requirements such that the adoption of the 2018 Tier 1 FOA, which did not comply with the statutory requirements, was arbitrary and capricious.

We begin with the Juras Study. The index of the Administrative Record submitted to the Court by defendants lists three documents associated with the Juras Study: (1) the Study itself; (2) a summary description of a presentation describing the findings of the Study at the Association for Public Policy Analysis & Management's ("APPAM") Fall Research Conference on November 2, 2017 ("the Juras Summary"); and (3) the presentation slides from the APPAM Conference (the "Juras Presentation").

58

The first of these documents, however, is not actually in the Administrative Record because defendants have withheld it from the Court and plaintiff, citing "deliberative process privilege." Administrative Record Index at 4 n.*, Aug. 2, 2018, ECF No. 47 ("Although the study described by this document is complete, the study report continues to undergo internal revision. Defendants thus withhold the document at this time pursuant to the deliberative process privilege. . . . Defendants will submit the full study paper to the Court and Plaintiffs when it is publicly available."). This document is entitled to no weight in our consideration for two independent reasons. First, we have no way of assessing a document that has been withheld from the Court.[21] Second, defendants' decision to adopt the FOAs in May 2018 cannot have been based on a report that still has not been finalized.[22]

The Juras Summary is equally unhelpful – it is less than a page long and focuses on the methodology rather than the conclusions of the Juras Study. See Panel Paper: Meta-Analysis of Federally-Funded Teen Pregnancy Prevention Programs (2017 APPAM

---

[21]    Withholding the document for "internal revision" in the midst of litigation also raises a question about the objectivity of the work product.

[22]    Driving home this point is the fact that in order for a document to be protected by the deliberative process privilege, it must be "pre-decisional." Tigue v. U.S. Dep't of Justice, 312 F.3d 70, 76–77 (2d Cir. 2002). That is, the document must "precede[], in temporal sequence, the decision to which it relates." Seife v. U.S. Dep't of State, 298 F. Supp. 3d 592, 614 (S.D.N.Y. 2018) (quoting Nat'l Congress for Puerto Rican Rights ex rel. Perez v. City of New York, 194 F.R.D. 88, 92 (S.D.N.Y. 2000)).

Fall Research Conference) at AR000022.  Defendants thus rely primarily on the Juras Presentation, a 14-page PowerPoint summarizing the Study's findings.  See APPAM Presentation 2017 Meta-Analysis at AR000008-21.  In particular, defendants point to a heading on the tenth slide of the Presentation that states there has been "No strong evidence that any program or individual characteristics affected outcomes."  Id. at AR000017.  But the following heading of the same slide identifies "[s]uggestive evidence that two program characteristics positively affected outcomes:  Programs designed for a single gender [and] Programs delivered one-on-one."  Id.  In any event, these statements relate to program characteristics, not the programs themselves.  Where the Juras Presentation discusses programs, it identifies twelve evaluations that found evidence of effectiveness based on at least one statistically significant behavioral impact.  Id. at AR000009; see also id. at AR000016 (displaying a chart identifying twelve programs that outperformed the control group as to the variable "Recent Sex").  It follows that the Juras Study, at least in the form that has been presented to the Court, identifies programs that have been proven effective and therefore does not support the agency's finding that there were no "viable options."

We turn next to the TPP Program Press Release,[23] which summarizes a 2016 report on the "rigorous evaluation studies" of funded and evaluated TPP projects. Press Release, Office of the Assistant Secretary for Health, Teen Pregnancy Prevention Program Facts (Aug. 28, 2017) at AR000029. The Press Release states that of 37 studies of projects, "73% either had no impact or had a negative impact on teen behavior, with some teens more likely to begin having sex, to engage in unprotected sex, or to become pregnant," and of the "18 funded projects that replicated curricula found on the TPP Program's approved list . . . Fourteen of the 18 projects (78%) produced no impact or negative impact on teen behavior." Id. Again, this Press Release shows that there were viable options because at least some of the programs had demonstrated positive results. Indeed, the statistics cited in the press release suggest that ten of the 37 projects (27%) had at least some positive impact, including four of the "projects that replicated curricula," although only one of these projects "showed sustained positive effect." Id.

The parties dispute whether the results of the 2016 report described in the Press Release were "questionable," see Defs.'

---

[23]    As some of the text of the version of the TPP Program Press Release in the Administrative Record at AR000029-31 is illegible, we have consulted the version of this Press Release posted on HHS's website at: https://www.hhs.gov/ash/about-ash/news/2017/teen-pregnancy-prevention-program-facts.html.

Reply at 14, Aug. 16, 2018, ECF No. 53, or "very strong," see Pl.'s
Reply at 21, Aug. 26, 2018, ECF No. 50 (citing Link Decl. Ex. 5 at
3-5, Email from Evelyn Kappeler, Director of OAH (July 26, 2017),
ECF No. 34 ("Cohort 1 data identified 12 TPP program models with
demonstrated positive behavioral impacts at varying time points
post program delivery. . . . The field considers the evidence from
the TPP Cohort 1 evaluations to be very strong.")).  We need not
resolve that dispute here.  What this report inarguably shows is
the "rigorous evaluation" process mandated by the statute at work.
No matter how the data is spun by the parties, the report shows
that at least some programs were "proven effective by rigorous
evaluation."  Even if the success rate did not meet defendants'
expectations, that would not provide an "adequate reason" for
defendants to abandon the statutory requirements of the TPP
Program.  See Encino, 136 S. Ct. at 2125.

Finally, defendants cite a report entitled "The Teen
Pregnancy Prevention Program (2010-2015): Synthesis of Impact
Findings," an exhibit submitted by plaintiff in this litigation
that is not part of the Administrative Record.  See Harker Decl.
Ex. 9 at 526-32, ECF No. 37-1 at 526-32.  Defendants cite to a
finding in this report that only four of 19 Tier 1 programs from
2010 to 2015 had statistically significant positive behavioral
impacts on any outcome measure.  Our analysis of this report is
the same as the Press Release.  Its most relevant finding is that

rigorous evaluation of TPP programs demonstrated that at least some programs reported statistically significant evidence of positive outcomes.

Notably absent and glaringly so from the Administrative Record is Mathematica Policy Research's latest TPP Evidence Review, published in April 2018.  See Julieta Lugo-Gil et al., "Updated findings from the HHS Teen Pregnancy Prevention Evidence Review: August 2015 through October 2016" ("2018 Evidence Review"), Harker Decl. Ex. 18, ECF No. 37-3 at 130-161.  In 2010, HHS contracted with Mathematica to provide it with periodic Evidence Reviews of the program models selected for the TPP Program.  Compl. ¶ 33.  Financial support for Mathematica's Evidence Review has come at least in part from the provision of the TPP Program providing funding "to carry out evaluations (including longitudinal evaluations) of teenage pregnancy approaches."  Compl. ¶ 30; see 2010 CAA, 123 Stat. at 3253; 2018 CAA, 132 Stat. at 733.  The 2018 Evidence Review, published the same week as the 2018 FOAs, identified four new programs that met its review criteria for evidence of effectiveness,[24] bringing the

---

[24]    The 2018 Evidence Review defines "evidence of effectiveness" as "evidence of at least one favorable statistically significant impact on at least one sexual risk behavior or reproductive health outcome of interest (sexual activity, number of sexual partners, contraceptive use, STIs, or pregnancy)." Harker Decl. Ex. 18, ECF No. 37-3.  These measures of effectiveness are consistent with the statute, which allocates funds to programs that have "been proven effective through rigorous evaluation to reduce teenage pregnancy,

total number to 48.  Harker Decl. Ex. 18, ECF No. 37-3 at 130-161.
Thus, according to an evaluation commissioned by HHS, there were
48 "viable options" to replicate in Tier 1.

Plaintiff argues that it was arbitrary and capricious for
defendants to ignore the 2018 Evidence Review.  Defendants respond
that the Juras Study and other materials cited above show that
"very few" of the programs selected by the TPP Evidence Review
actually yielded positive results.  Defs.' Mem. of Law at 6, Aug.
2, 2018, ECF No. 49.  But this counter-argument amounts to a
concession that there were programs available that have been proven
effective, including by the Juras Study itself.  Even assuming
that the Juras Study provided defendants with "a reasoned
explanation" to no longer rely upon the TPP Evidence Review, it
did not give them an "adequate reason" to flaunt the statutory
requirement to "replicat[e] programs that have been proven
effective through rigorous evaluation."  See Encino, 136 S. Ct. at
2125; see also Hoag Mem. Hosp. Presbyterian v. Price, 866 F.3d
1072, 1081 (9th Cir. 2017) (taking agency action in disregard of
the plain text of a statute is arbitrary and capricious).

---

behavioral risk factors underlying teenage pregnancy, or other associated risk
factors."  132 Stat. at 733 (emphasis added).

64

2.    **2018 Tier 2 FOA**

The same infirmities identified above do not infect the 2018 Tier 2 FOA.  We begin again with the text of the Tier 2 provision in the statute, which makes funding "available for research and demonstration grants to develop, replicate, refine, and test additional models and innovative strategies for preventing teenage pregnancy."  2018 CAA, 132 Stat. at 733.  Unlike Tier 1, Tier 2 does not require proof of effectiveness nor faithfulness to a proven program.  Rather, Congress's use of "develop, refine and test" all suggest experimentation.  We define the fourth verb, "replicate," the same way as above, see Mathis v. S.E.C., 671 F.3d 210, 218 (2d Cir. 2012) (defining "willful" the same way in different subsections of a statute), but it nonetheless takes on new meaning when it modifies "additional models" instead of "programs that have been proven effective."  The use of "additional" denotes that the models to be replicated in Tier 2 can include some that had not been sufficiently "proven effective" to make the cut for Tier 1.  HHS is afforded broad discretion by the statutory use of "innovative strategies," which by nature of their novelty may not yet be supported by proof of effectiveness.

Plaintiff does not argue that the 2018 Tier 2 FOA violates any portion of this statutory language, but rather points to the introductory clause of the TPP Program statute, which provides that any funding, even if it is used to develop an "innovative

strategy," must be for "medically accurate and age appropriate programs that reduce teen pregnancy." 132 Stat. at 733. Plaintiff therefore asserts that the 2018 Tier 2 FOA is contrary to the statute because its "public health priorities" dictate that HHS will fund programs that are not "medically accurate." Pl.'s Reply at 20, Aug. 9, 2018, ECF No. 50. This argument fails as a matter of statutory structure. Tier 2's place in the TPP Program is the laboratory where applicants can test programs that might someday be eligible for replication in Tier 1. See Kantor Decl. ¶ 38, Aug. 9, 2018, ECF No. 52 ("The Tier 2 funding is designed to support new and innovative approaches to teen pregnancy prevention programs that do not have previous rigorous research demonstrating their effectiveness."). At this juncture, the Court cannot conclude as a matter of law that any program developed under the SMARTool or TAC and analyzed through the lens of the "public health priorities" would lack "medical accuracy." If HHS actually awards Tier 2 grants to applicants whose proposals are not medically accurate, that may be the basis for future litigation, but that issue is not currently before the Court.

The relevant distinction between the Tiers is statutory. While defendants are precluded from using evaluative tools like the SMARTool and TAC as a substitute for "programs proven effective through rigorous evaluation," they may use them to "develop and "test innovative strategies" under Tier 2. TPP FY 18 Tier 2 FOA

at AR000137.  Indeed, plaintiff argued that the 2018 Tier 1 FOA is contrary to law because it would improperly fund unproven programs that belonged in Tier 2.  Pl.'s Mem. of Law at 21, July 24, 2018, ECF No. 36 ("The 2018 Tier 1 FOA also seeks to transfer the funding for Tier 1 into the Tier 2 appropriation."); Kantor Decl. ¶ 38, ECF No. 52 ("By shifting to an approach that allows applicants to create or choose a program with no previous rigorous evidence of effectiveness, the Tier 1 program has essentially been discontinued in favor of a Tier 2 approach . . . .").  If relying on the SMARTool, TAC, and "public health priorities" in Tier 1 meant adopting "a Tier 2 approach," it logically follows that they were not improper considerations for Tier 2.

The same problems plague plaintiff's argument that the 2018 Tier 2 FOA is arbitrary and capricious.  While defendants cannot rely on the SMARTool and TAC in violation of the statutory requirements of Tier 1, defendants adequately justify employing these tools to test novel approaches in an attempt to improve the Teen Pregnancy Prevention Program.  Tier 2 serves as a laboratory for developing new model programs, and, in defendants' view, the SMARTool and TAC identify the "key elements of effective programs recognized by social science research to affect adolescent risk behaviors."  TPP FY 18 Tier 2 FOA at AR000137.  Nothing in the record suggests that these tools are so inherently flawed that it would be inappropriate to use them as a reference point in devising

67

a grant proposal. Defendants need not demonstrate that this approach is better than the ones used for the 2010 and 2015 FOAs: "it suffices that the new policy is permissible under the statute, that there are good reasons for it, and that the agency believes it to be better, which the conscious change of course adequately indicates." Fox, 556 U.S. at 515. Defendants' adoption of the 2018 Tier 2 FOA therefore falls "within the bounds of reasoned decisionmaking." Balt. Gas & Elec. Co. v. Natural Res. Def. Council, Inc., 462 U.S. 87, 104 (1983).

**E. Remedies**

A plaintiff seeking a permanent injunction must satisfy a four-factor test: "(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." Monsanto Co. v. Geertson Seed Farms, 561 U.S. 139, 156-57 (2010) (quoting eBay v. MercExchange, L.L.C., 547 U.S. 388, 391 (2006)).

These four factors all support granting an injunction here. As to irreparable harm, plaintiff has been injured based on its inability to compete under the 2018 FOAs. See Int'l Franchise Ass'n, Inc. v. City of Seattle, 803 F.3d 389, 411 (9th Cir. 2015) ("A rule putting plaintiffs at a competitive disadvantage

68

constitutes irreparable harm."). Defendants rehash their arguments on standing as to why plaintiff has not suffered injury, but they are no more convincing in this context. If HHS is allowed to issue grants under the 2018 Tier 1 FOA, plaintiff's injury will become irreparable: "there can be no do over and no redress." League of Women Voters of U.S. v. Newby, 838 F.3d 1, 9 (D.C. Cir. 2016) (quoting League of Women Voters of N.C. v. North Carolina, 769 F.3d 224, 247 (4th Cir. 2014)). Turning to the second factor, given the nature of plaintiff's competitive injury, it follows that monetary damages are inadequate to ensure that plaintiff may compete for funding on a level (and legal) playing field. See City of Los Angeles v. Sessions, 293 F. Supp. 3d 1087, 1100 (C.D. Cal. 2018).

The final two factors merge when an injunction is to be issued against the government. See Pursuing Am.'s Greatness v. FEC, 831 F.3d 500, 511 (D.C. Cir. 2016) (citing Nken v. Holder, 556 U.S. 418, 435 (2009)). These factors clearly favor plaintiff. It is evident that "[t]here is generally no public interest in the perpetuation of unlawful agency action." Newby, 838 F.3d at 12 (citing Pursuing Am.'s Greatness, 831 F.3d at 505 (D.C. Cir. 2016)); see also Central United Life, Inc. v. Burwell, 128 F. Supp. 3d 321, 330 (D.D.C. 2015), aff'd, 827 F.3d 70 (D.C. Cir. 2016) ("Forcing federal agencies to comply with the law is undoubtedly in the public interest."). The inverse is also true: "there is

a substantial public interest in 'having governmental agencies abide by the federal laws that govern their existence and operations.'" Newby, 838 F.3d at 12 (quoting Washington v. Reno, 35 F.3d 1093, 1103 (6th Cir. 1994)). We cannot fathom how permitting defendants to award grants pursuant to an FOA that is contrary to law would serve either the interests of the government or public.

## IV. CONCLUSION

Plaintiff's motion for summary judgment is granted as to the 2018 Tier 1 FOA because the evaluative tools that applicants for Tier 1 grants must "replicat[e]" are not "programs" and have not "been proven effective through rigorous evaluation," as required by the statute. Plaintiff's motion for summary judgment is denied as to the 2018 Tier 2 FOA. Defendants' motion to dismiss is denied, and their cross-motion for summary judgment is denied as to the 2018 Tier 1 FOA and granted as to the 2018 Tier 2 FOA. Defendants are permanently enjoined from using the 2018 Tier 1 FOA as the basis for awarding or disbursing TPP Program funds. The Clerk of Court is respectfully directed to terminate the motions pending at ECF Nos. 32 and 45 and close this case.

**SO ORDERED.**

Dated: New York, New York
August 30, 2018

NAOMI REICE BUCHWALD
UNITED STATES DISTRICT JUDGE

70

<u>Counsel for Plaintiff</u>:          Ada Victoria Anon
                                     Marcus Aaron Asner
                                     Drew A. Harker
                                     Alice Clare Campbell Huling
                                     Arnold & Porter Kaye Scholer LLP

                                     Carrie Y. Flaxman
                                     Richard Muniz
                                     Planned  Parenthood  Federation  of
                                     America

<u>Counsel for Defendants</u>:         Benjamin Henry Torrance
                                     U.S. Attorney's Office, SDNY

<u>Counsel for Amici Curiae</u>:      Boris Bershteyn
                                     Micah Festa Fergenson
                                     Natalie Margaret Gabrenya
                                     Skadden, Arps, Slate, Meagher & Flom
                                     LLP